STATE OF GEORGIA, Plaintiff,

v.

Janet RENO, et al., Defendants.

Civ. A. No. 90–2065.

United States District Court,
District of Columbia.

Feb. 3, 1995.

Michael A. Carvin, Charles J. Cooper, Shaw, Pittman, Potts & Trowbridge, Washington, DC, David Wolbert, Wolbert & Hermann, Michael J. Bowers, Atty. Gen. of the State of Ga., Carol Cosgrove, Asst. Atty. Gen., Atlanta, GA, for plaintiff.

John Tanner, Thomas Armstrong, Christopher Herren, Malik Cutlar, U.S. Dept. of Justice, Voting Section, Civil Rights Div., Donna Murphy, Mary D. Rodriguez, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for defendants.

Before HENDERSON, Circuit Judge, JOHNSON * and HARRIS, District Judges.

## MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

The State of Georgia brought this declaratory judgment action under section 5 of the Voting Rights Act of 1965 (Act), 42 U.S.C. § 1973c, seeking a declaration that the Georgia legislature's creation of 62 elective superior court judgeships after November 1, 1964 "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. A bench trial was held on October 11–14, 1994, with closing argument presented on November 17, 1994.[1] On the evidence presented, the court holds that the State of Georgia is entitled to the declaration it seeks. In compliance with Rule 52 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The State of Georgia is divided into 46 judicial circuits, each of which is allocated a specific number of superior court judges who serve four-year terms. See Plaintiff's Exhibit 88, Ga.Code Ann. § 15–6–2, Ga. Const. art. 6, § 7, ¶ 1.

2. Superior court judges are elected in non-partisan, designated-post primaries by circuit-wide majority vote followed by plurality vote general elections. See Ga.Code Ann. §§ 21–2–135, 21–2–284.1, 21–2–501.[2] The

---

* Judge Johnson dissents and reserves the right to file a dissenting opinion.

1. By stipulation of the parties, the direct evidence was presented in documentary form and the trial was conducted before a single judge of this three-judge court. See Order filed Aug. 26, 1994. Closing arguments were made before the entire three-judge court.

2. Under Georgia's election process, a candidate must garner a majority of votes cast in the circuit primary to make it to the general election. Ga. Code Ann. § 21–2–284.1. If no candidate wins a

Georgia General Assembly established the designated-post and majority vote requirements in June 1964. *See* 1964 Ga.Laws No. 26 §§ 34–1002, 34–1514 (June 24, 1964) (now codified at Ga.Code Ann. § 21–2–501).[3] By a 1966 amendment to the Georgia constitution, general elections, which had previously been state-wide, were made circuit-wide to correspond to the primaries' scope. *See* 1966 Ga. Laws No. 47. This change was cleared by the United States Attorney General in 1968. *See Brooks v. Georgia State Bd. of Elections*, 775 F.Supp. 1470, 1478 n. 11 (S.D.Ga.1989).

3. Despite Georgia's popular election system, a majority of superior court judges in office since 1968—153 of 233—have initially come to their posts by gubernatorial appointment. Plaintiff's Exhibit 93 at 11. The Georgia Constitution provides that the governor fill any mid-term vacancy or new judicial position with his appointee who serves until the next scheduled election. Ga. Const. art. 6, § 7, ¶ 3. All Georgia governors in office since 1972 have appointed judges from a list provided by the Judicial Nominating Commission (Commission). The Commission, which consists of five gubernatorial appointees and five Georgia State Bar (Bar) ex officio members, has from the beginning followed substantially the same procedure: It (1) notifies bar members in a given jurisdiction of a court vacancy and the nomination deadline therefor, (2) accepts nominations for the vacancy from Bar members, (3) sends a letter to each nominee requesting that he complete an enclosed questionnaire and send it with other specific information to each Commission member by a set date, (4) investigates each candidate, discussing among themselves and with other Bar members each nominee's qualifications and obtaining information regarding any past disciplinary action, (5) meets to evaluate and compile, by secret ballot, a list of five nominees and (6)

sends the Governor the list of nominees, along with the questionnaire each submitted and a report of the vote tally. A. Gus Cleveland, "The Judicial Nominating and Appointment Process in Georgia 1971–1990," 27 Ga. St.Bar J., Nov. 1990 at 54–59 (Exhibit A to Plaintiff's Direct Testimony of Cubbedge Snow, Jr.).

4. As of November 1, 1964, 61 superior court judgeships existed in the State of Georgia. *See* Plaintiff's Exhibit 1.

5. Since that time, 77 additional judgeships have been statutorily created, of which 62, including 14 that have never been filled,[4] have been denied clearance by the Attorney General. *See* Plaintiff's Exhibits 1, 3.

6. The 62 challenged judgeships were created by 62 separate acts during the period March 1967 to April 1992. *See* Plaintiff's Exhibits 21–77, 78–82.

7. In 1973 the Georgia General Assembly directed the Georgia Supreme Court to create the Judicial Council, *see* Ga.Code Ann. § 15–5–20, and itself established the Administrative Office of the Courts (AOC) to act as the Judicial Council's staff, Ga.Code Ann. § 15–5–22.

8. Since the creation of these two bodies, the AOC has conducted extensive studies upon which the Judicial Council has relied in making recommendations to the Georgia General Assembly regarding the creation of new judgeships. *See* Plaintiff's Direct Testimony of Robert L. Doss at 5; Plaintiff's Exhibits 4–20.

9. Each superior court judgeship created since 1974 has been expressly recommended by the Judicial Council based on the AOC's detailed studies of population and caseload. *See* Plaintiff's Exhibits 4–20; *see also* Plaintiff's Direct Testimony of Robert L. Doss, Assistant Director of the AOC from 1973–

---

circuit-wide majority, a run-off primary is held between the two front runners. *Id.* The name of the primary winner is placed on the general election ballot along with a space for a write-in vote. *Id.* § 21–2–501.

3. Before that time, a simple plurality was sufficient for election.

4. In a related challenge to Georgia's judicial selection process brought under section 2 of the

Act, a three-judge court of the Southern District of Georgia enjoined the state from filling any vacant challenged posts but granted Georgia leave to retain judges in the already filled posts until March 1, 1995. *See Brooks v. Georgia State Bd. of Elections*, 790 F.Supp. 1156 (S.D.Ga. 1990); *Brooks v. Georgia State Bd. of Elections*, 848 F.Supp. 1548 (1994).

1975 and Director of the AOC from 1975 to the present, at 4–11 (explaining that race had "play[ed] no part whatever" in the AOC or Judicial Council's deliberations regarding new judgeships).

10. The record contains no affirmative evidence that any of the pre-Judicial Council judgeships was created for a racially discriminatory purpose and offers substantial credible evidence that those judgeships were added solely to compensate for increased caseload.

Director Doss testified that during his early research for the AOC he "learned that at least during the decade ending in 1973 recommendations to the General Assembly for additional superior court judgeships or judicial circuits were governed mainly by population considerations as they related to judicial workload," that recommendations for additional judgeships were made "by individual judges, by attorneys, or by other interested persons" to their local state legislators who then introduced appropriate legislation, and that "there was a traditional 'rule of thumb' generally followed during this time period under which new judgeships were typically proposed on the basis of approximately 50,-000 persons per judge in the affected judicial circuit." *Id.* at 3–4.

Former Georgia state representative Wayne Snow, Jr., who served on the House Judiciary Committee from 1963 through 1983, described the pre-Judicial Council judgeship creation process in some detail:

Prior to the formation of the Judicial Council in 1973, legislators who sponsored bills to enact judgeships would appear before the Judiciary Committee. The committee required sponsors to be prepared to show and ·demonstrate a true need. At that time, we estimated that an additional judgeship would cost in excess of $100,-000.00 of State funds annually and would balance the showing of need with the available funding. Legislators would present caseload information, population trends, and other evidence they had demonstrating need.

\* \* \* \* \* \*

At no time did anyone on the Judiciary Committee or in the legislature express that race was a reason or a factor to create or not to create a new judgeship. In no instance where a judgeship was created while I was on the Judiciary Committee was race involved in the decision to enact a judgeship. The issue was always need.

At no time during my service in the General Assembly did anyone ever suggest that Georgia's judicial election system was racially discriminatory. No one ever suggested that electing judges by a majority vote requirement or by circuit-wide vote was discriminatory. In fact, the method of election was controlled by other statutes which were not part of the legislation to create new judgeships.

Plaintiff's Direct Testimony of Wayne Snow, Jr. at 2–3, 4.

The Honorable Horace T. Ward, Senior District Judge of the United States District Court for the Northern District of Georgia, who served as a Georgia state senator from 1965 until 1974, testified:

While I was in the State Senate, I served a number of years on the Judiciary Committee. While on the Judiciary Committee and in the Senate generally, statutes were proposed and acted upon that increased the number of superior court judges in various circuits in the state. My recollection of the information and materials presented in support of legislative action increasing superior court judges or creating new circuits related to caseload, increasing population, and the like. This was the basis upon which I voted for or against such legislation. At no time, to my knowledge, was any argument or any statement made by any senator or witness that there was a racial consideration in the decision to create new judgeships or judicial circuits. The method of electing these judgeships was not an issue when the Senate acted upon this legislation.

Plaintiff's Direct Testimony of the Honorable Horace T. Ward at 2.

11. Based on the evidence and the preceding findings of fact, it is clear to the court that the 62 judgeships added between 1968 and 1992 were created for the nondiscrimina-

tory purpose of addressing increasing caseloads in specific circuits.

## CONCLUSIONS OF LAW

1. Georgia is a "covered jurisdiction" under section 5 of the Act, 30 Fed.Reg. 9897 (1965); 28 C.F.R. § 51.4; *id.* pt. 51, app.; *Brooks v. Georgia State Bd. of Elections,* 997 F.2d 857, 859 (11th Cir.1993),[5] and must therefore obtain clearance from this court or from the United States Attorney General before implementing "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." 42 U.S.C. § 1973c.

2. The creation of new superior court judgeships in Georgia has been held to be a "standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964" subject to the clearance requirement because "it has a potential for discrimination." *Brooks v. Georgia State Bd. of Elections,* 775 F.Supp. 1470, 1477–80 (S.D.Ga.1989) (citing *Dougherty County, Ga., Bd. of Educ. v. White,* 439 U.S. 32, 42, 99 S.Ct. 368, 374, 58 L.Ed.2d 269 (1978)), *aff'd mem.,* 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990).

3. "It is well established that in a declaratory judgment action under § 5, the plaintiff State has the burden of proof." *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973) (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 335, 86 S.Ct. 803, 822, 15 L.Ed.2d 769 (1966)).

■ 4. Thus, it is incumbent upon Georgia to prove the absence of both discriminatory effect and discriminatory purpose in the creation of the superior court judgeships. *City of Pleasant Grove v. United States,* 479

U.S. 462, 469, 107 S.Ct. 794, 798, 93 L.Ed.2d 866 (1987) (citing *City of Rome v. United States,* 446 U.S. 156, 183 n. 18, 100 S.Ct. 1548, 1564 n. 18, 64 L.Ed.2d 119 (1980)).

■ 5. Georgia has established the absence of discriminatory effect. Section 5 prohibits only changes that produce a "retrogressive" discriminatory effect, that is, changes that "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976); *see also Lockhart v. United States,* 460 U.S. 125, 133, 103 S.Ct. 998, 1003, 74 L.Ed.2d 863 (1983) ("Section 5 was intended to halt actual retrogression in minority voting strength. . . ."). Thus, a change that "d[oes] not increase the degree of discrimination against blacks ... [is] entitled to § 5 preclearance." *Id.* at 134, 103 S.Ct. at 1004 (citing *Beer*). The defendants have conceded, as they must, that Georgia's creation of the additional judgeships is not retrogressive. *See* Defendants' Proposed Conclusion of Law No. 13 ("The voting changes occasioned by the implementation of the 62 elected judgeships at issue here are not retrogressive with respect to minority voting strength, as that term has been construed by the Supreme Court in *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1975) [sic].".). In fact, they have never objected to the creation of new judgeships per se—only the way in which those judgeships are filled, namely through elections that are circuit-wide and require a majority of votes cast. Yet neither of those characteristics can be deemed retrogressive. The majority vote requirement, as noted above, was already in place on the Act's

---

5. A "covered jurisdiction" under section five is "a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of [title 42] based upon determinations made under the first sentence of section 1973b(b) of [title 42] are in effect." 42 U.S.C. § 1973c. The relevant prohibitions apply to any state or political subdivision "which (i) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (ii) the Plaintiff's Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were regis-

tered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964." *Id.* § 1973b(b). A "test or device" is defined as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class." *Id.* § 1973b(c).

effective date, while the circuit-wide scope of the primaries, although adopted after that date, was cleared by the Attorney General.[6]

Nevertheless, the defendants argue that when Congress extended the Act in 1983, after both *Beer* and *Lockhart*, it expressed an intent to incorporate section 2 of the Act into section 5 so that whenever a change violates section 2, clearance must be denied under section 5 regardless of retrogression.[7] No court has yet adopted the defendants' position and, given the scant support they have offered, we decline to do so.

As Justice Kennedy recently explained, sections 2 and 5 of the Act "differ in structure, purpose, and application." *Holder v. Hall*, ⸺ U.S. ⸺, ⸺, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994). One major difference is that section 5 on its face applies only to states that employed discriminatory voting schemes as of certain benchmark dates, thereby creating a voting strength "baseline" against which to measure the effect of proposed voting changes in covered jurisdictions. *See Holder*, ⸺ U.S. at ⸺, 114 S.Ct. at 2587 (Kennedy, J., joined by Rehnquist, C.J.). As the *Beer* Court explained, in imposing and extending the admittedly extraordinary clearance requirement,[8] "Congress desired to prevent States

---

**6.** The change to circuit-wide elections had, if anything, an ameliorative rather than dilutive effect on minority voting strength, replacing as it did the previous state-wide elections. The reduction in electorate size produced some circuits with a substantially higher percentage of black voters, thereby increasing the likelihood that black judges would be elected. *See Thornburg v. Gingles*, 478 U.S. 30, 55–56, 106 S.Ct. 2752, 2768–69, 92 L.Ed.2d 25 (1986) (explaining that where voting is racially polarized, a high percentage of white voters may " 'minimize or cancel' black voters' ability to elect representatives of their choice.") (quoting S.Rep. No. 417, 97th Cong., 2nd Sess. 28 (1982)); *cf. Beer*, 425 U.S. at 141, 96 S.Ct. at 1363 (concluding that "an ameliorative new legislative apportionment.cannot violate § 5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution.").

**7.** Section 2 provides:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section

establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973. No showing of retrogression is required to establish a section 2 violation. *See generally Thornburg v. Gingles*, 478 U.S. 30, 42–47, 106 S.Ct. 2752, 2762–65, 92 L.Ed.2d 25 (1986) (setting out requirements of section 2 vote dilution violation); *Holder v. Hall*, ⸺ U.S. ⸺, ⸺, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994) ("Retrogression is not the inquiry in § 2 dilution cases.") (Kennedy, J., joined by Rehnquist, C.J.).

**8.** The extraordinary nature of section 5 has long been recognized. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), Justice Black, dissenting in part, expressed his conviction that "§ 5 which gives federal officials power to veto state laws they do not like is in direct conflict with the clear command of our Constitution that 'The United States shall guarantee to every State in this Union a Republican Form of Government' " and that "the inevitable effect of any such law which forces any one of the States to entreat federal authorities in faraway places for approval of local laws before they can become effective is to create the impression that the State or States treated in this way are little more than conquered provinces.". *Id.* at 359–60, 86 S.Ct. at 834–35; *see also Georgia v. United States*, 411 U.S. 526, 545, 93 S.Ct. 1702, 1713, 36 L.Ed.2d 472 (Powell, J., dissenting) ("It is indeed a serious intrusion, incompatible with the basic structure of our system, for federal authorities to compel a State to submit its legislation for advance review."); *United States v. Board of Commissioners of Sheffield, Ala.*, 435 U.S. 110, 141, 98 S.Ct. 965, 984, 55 L.Ed.2d 148 (1978) ("[Section 5's] so-called 'preclearance' requirement is one of the most extraordinary remedial provisions in an Act noted for its broad remedies. Even the Department of Justice has described it as a 'substantial departure ... from ordinary concepts of our federal system'; its encroach-

from 'undo[ing] or defeat[ing] the rights recently won' by Negroes," *Beer,* 425 U.S. at 140, 96 S.Ct. at 1363 (quoting H.R.Rep. No. 397, 91st Cong., 1st Sess. 8 (1969)) (alteration in opinion), and "to insure that [the gains thus far achieved in minority political participation] shall not be destroyed through new (discriminatory) procedures and techniques," *id.* at 140–41, 96 S.Ct. at 1363–64 (quoting S.Rep. No. 295, 94th Cong., 1st Sess. 19 (1975)) (alteration in opinion). Further, "Congress explicitly stated that 'the standard [under § 5] can only be fully satisfied by determining on the basis of the facts found by the Attorney General [or the District Court] to be true whether the ability of minority groups to participate in the political process and to elect their choices to office is *augmented, diminished, or not affected* by the change affecting voting. . . .' " *Id.* at 141, 96 S.Ct. at 1363 (quoting H.R.Rep. No. 196, 94th Cong., 1st Sess. 60 (1975)) (alteration and emphasis in opinion). Thus, the *Beer* court reasoned, "the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."

There is little reason to believe Congress has changed its mind since *Beer* and *Lockhart.* The defendants' sole authority for their novel argument consists of a single sentence in a Senate Judiciary Committee report footnote and their own regulation. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 12 n. 31 (1982) ("In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2.") (Report); 28 C.F.R. § 51.55(b)(2) ("In those instances in which the Attorney General concludes that, as proposed, the submitted change is free of discriminatory purpose and retrogressive effect, but also concludes that a bar to implementation of the change is necessary to prevent a clear viola-

tion of amended Section 2, the Attorney General shall withhold Section 5 preclearance."). In our opinion, neither shows a change in Congressional intent.

The sentence cited from the Report must be considered in context. When it extended the Act in 1982, Congress amended section 2 in reaction to and repudiation of the Supreme Court's plurality position in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), and its progeny, to make clear that "proof of discriminatory intent is not required to establish a violation of Section 2," Report at 2, any more than it is to prevent section 5 clearance. The sentence cited by the defendants was intended merely to emphasize that proof of the requisite unlawful effect is in itself sufficient under either section, regardless of motive. We do not read the lone remark to change the nature of the effect necessary to deny section 5 clearance. That the Committee was aware of *Beer* and its retrogression holding is clear from the immediately preceding sentence. Report at 12 n. 31 ("Under the rule in *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, a voting change which is ameliorative is not objectionable unless the change 'itself so discriminates on the basis of race or color as to violate the Constitution.' 425 U.S. at 141, 96 S.Ct. at 1364; *see also* 142 n. 14, 96 S.Ct. at 1364 n. 14 (citing to the dilution cases from *Fortson v. Dorsey* [379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) ] through *White v. Regester* [412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) ] )."). Had Congress intended to overturn that holding it could have amended section 5 as it did section 2, with an explanation similar to the lengthy one on the section 2 amendment. *See* Report at 15–43. It did not. Given the Congressional inaction, the earlier legislative history supporting the retrogression requirement, set out in *Beer,* 425 U.S. at 140–41, 96 S.Ct. at 1363–64,[9] and the extensive case law applying the requirement, both before and after the 1982 amendments,[10] we decline to adopt the defendants'

---

ment on state sovereignty is significant and undeniable.") (Stevens, J, joined by Burger, C.J., and Rehnquist, J., dissenting) (footnote omitted; ellipsis in opinion).

9. *See supra* Conclusion of Law 5 ¶ 3.

10. The Supreme Court continues to construe section 5 to require retrogression, *see Shaw v. Reno,* —— U.S. ——, —— ——, 113 S.Ct. 2816, 2830–31, 125 L.Ed.2d 511 (1993) ("Under [the 'nonretrogression'] principle, a proposed voting change cannot be precleared if it will lead to 'a retro-

position based on the snippet of legislative history they have offered.

■ As for the DOJ regulation, it is entitled to no deference from this court where, as here, Congress has made clear its contrary intent. *See Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

For the foregoing reasons, we conclude that the creation of the additional superior court judgeships has no discriminatory effect under section 5 because it is not retrogressive.

■ 6. The additional judgeships were not established for a discriminatory purpose. This conclusion flows ineluctably from our factual findings above regarding the State of Georgia's purpose in creating new superior court judgeships and the methods employed to do so. *See supra* Findings of Fact 7–11. The defendants assert discriminatory intent can be inferred from the various statutes' reference to the existing electoral process. *See, e.g.,* Plaintiff's Exhibit 21 § 2 (election for new judgeship "shall be held and conducted in the manner hereafter provided by law for the election of judges of superior courts of this State."). We view this argument, however, simply as an attempt to circumvent the section 5 retrogression rule and thus to challenge the majority vote requirement, which was in force on November 1, 1964, the Act's effective date. Further, the evidence affirmatively shows that the majority vote requirement was not even discussed when the new judgeships were subsequently created. *See supra* Finding of Fact 10. Thus, we do not see how the statutory recitation of the cited boilerplate language, which does not even describe the specific electoral method to be used, can be construed as evidence of discriminatory intent in creating the new judgeships.

7. Plaintiff State of Georgia is entitled under section 5 of the Act to a declaration, as set out in the accompanying order, that the creation of the 62 additional judgeships since the Act's effective date "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c.

### ORDER

Plaintiff State of Georgia brought this action seeking a declaratory judgment that 63 state statutes enacted after November 1, 1964, the effective date of the Voting Rights Act of 1965 (Act), creating or extending 62 new state superior court judgeships do not discriminate on the basis of race or color in violation of section 5 of the Act, 42 U.S.C. § 1973c. The case having been tried before the court, for the reasons stated in the accompanying Memorandum Opinion, it is

ORDERED, that judgment be entered in the plaintiff's favor and it is further .

DECLARED, that the 63 statutes at issue do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color under section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c.

IT IS SO ORDERED.

gression in the position of racial minorities with respect to their effective exercise of the electoral franchise' " (*quoting Beer,* 425 U.S. at 141, 96 S.Ct. at 1364) (dictum), and this district has continued to impose the requirement, *see State of New York v. United States,* 874 F.Supp. 394, 397–98 (1994) (expressly rejecting the defendants'· theory); *Texas v. United States,* 802 F.Supp. 481, 485–86 (D.D.C. 1992) ("In order to grant preclearance to a reapportionment plan a court must make two findings. First, the plan may not be retrogressive in terms of minority voting rights when compared to the plan that would be in effect were the plan in question not approved.") (citing *Beer*); *County Council of Sumter County, S.C. v. United States,* 596 F.Supp. 35, 39 (D.D.C.1984) ("In order to rebut the inference of discriminatory effect, plaintiffs here were required to prove that the at-large election system in Summer County will not 'lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.' ") (quoting *Beer,* 425 U.S. at 140, 96 S.Ct. at 1363).