STATE OF ARIZONA, Plaintiff,

v.

Janet RENO, et al., Defendants.

Civ. A. No. 94–2054 (DST, U.S.C.A.; NHJ; RMU).

United States District Court, District of Columbia.

June 16, 1995.

Rex E. Lee, Carter G. Phillips, Jonathan E. Nuechterlein, Ann K. Adams, Sidley & Austin, Washington, DC, and Grant Woods, Atty. Gen. and H. Leslie Hall, Chief Counsel Civ. Div., Phoenix, AZ, for plaintiff.

Donna M. Murphy, Luis A. Torres, Elizabeth Johnson, Rebecca J. Wertz, and Sarabeth Donovan, Civil Rights Div., Voting Section, U.S. Dept. of Justice, Washington, DC, for defendants.

Before: TATEL, Circuit Judge, and JOHNSON and URBINA, District Judges.

### MEMORANDUM OPINION

On April 8 and May 16, 1994, respectively, the Attorney General denied preclearance for the addition of four judgeships to the Arizona Superior Court in Coconino and Navajo counties. In accordance with section 5 of the Voting Rights Act of 1965, Arizona now seeks

a declaratory judgment from this court that the addition of these seats "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [on account of membership in a language minority group]." Voting Rights Act, § 5, 42 U.S.C. § 1973c (1988).

This case is before the court on plaintiff Arizona's motion for summary judgment or, in the alternative, partial summary judgment on the issue of effect, and on its motion to limit discovery on the issue of purpose. The United States opposes summary judgment, arguing that disputed issues of material fact remain and that it needs additional discovery on both issues. The court heard oral argument on May 2, 1995. For the reasons set forth below, we deny plaintiff's motion for summary judgment, grant plaintiff's alternative motion for partial summary judgment on the issue of effect, and deny plaintiff's motion to limit discovery.

I.

The State of Arizona and both Coconino and Navajo counties are covered jurisdictions under section 4 of the Voting Rights Act, 42 U.S.C. § 1973b(b) (1988). As such, they cannot enforce any "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1972" unless they either obtain the approval of the Attorney General or a declaratory judgment from a three-judge court of the United States District Court for the District of Columbia declaring that the change does not have the "purpose" and will not have the "effect" of denying or abridging the right to vote on account of race, color, or membership in a language minority group. *See* Voting Rights Act § 5, 42 U.S.C. § 1973c; *see also* 28 C.F.R. § 51.10 (1994).

Both Coconino and Navajo counties added two judgeships, known as "divisions," to their branches of the Arizona Superior Court—Coconino in May 1980 and August 1990; Navajo in 1975 and 1988—without obtaining either preclearance from the Department of Justice or a declaratory judgment from this court, as required by section 5. The new judgeships were filled in the same manner as

those in existence in November of 1972: each seat on the Superior Court appears separately on the ballot and is selected by majority vote in a county-wide election.

In April of 1993, following *Clark v. Roemer,* 500 U.S. 646, 111 S.Ct. 2096, 114 L.Ed.2d 691 (1991), where the Supreme Court rejected the argument that section 5's requirements did not apply to the addition of seats to a court in a covered jurisdiction, *see id.* at 653, 111 S.Ct. at 2101, the Department of Justice contacted county officials to inform them that they would have to obtain clearance for the new judgeships. Shortly thereafter, Arizona submitted the additional seats in both counties to the Department for clearance.

In the spring of 1994, the Department notified Arizona that it would not approve the new judgeships. Citing evidence that both counties were characterized by racially polarized voting, the Department stated that the county-wide elections appeared to restrict the ability of Native American voters to elect the candidates of their choice and observed that if the counties instead used a multi-district scheme, Native Americans would likely constitute a majority of the voters in at least one district in each county. *See* Letters from Deval Patrick, Asst. Att'y Gen., Civil Rights Div. to Terence C. Hance, Coconino County Att'y 1–2 (Apr. 8, 1994) and to D. Rand Henderson, Dep. County Att'y, Navajo County 1–2 (May 16, 1994), *in* Def. Mem. Opp. Summ.J. Ex. K.1 & K.2. Arizona filed a complaint in this court seeking a declaratory judgment that the additional seats had neither the purpose nor the effect of discriminating on account of race or color. In November of 1994, the Attorney General obtained an injunction from the United States District Court for the District of Arizona enjoining the November 1994 general election for the Superior Court in both counties and ordering the judges currently holding those seats to remain in their positions until proceedings in this court are concluded. *See United States v. Arizona,* No. 94cv1845 (D.Ariz. Oct. 17, 1994) (order granting preliminary injunction).

In the motions pending before this court, Arizona contends that the addition of the new

judgeships was not "retrogressive" and that summary judgment is therefore appropriate on the issue of discriminatory effect. Arizona also seeks summary judgment on the issue of purpose, arguing that the United States has not alleged that the at-large electoral scheme is "blatantly" or "starkly" racist, the only showing, according to Arizona, that is sufficient to prove a discriminatory purpose under section 5 absent retrogression. In the alternative, Arizona asks us to limit discovery on the issue of purpose to the legislative and administrative history of the decisions to add these judgeships.

## II.

Congress enacted the Voting Rights Act "to rid the country of racial discrimination in voting. The heart of the Act is a complex scheme of stringent remedies aimed at areas where voting discrimination has been the most flagrant." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 811, 15 L.Ed.2d 769 (1966) (footnote omitted). Section 5 of the Act imposes strict oversight on those states and jurisdictions that as recently as 1964 used the most overtly discriminatory tests and devices to prevent minorities from fully participating in the electoral process. *See* 42 U.S.C. § 1973b(b) & (c) (1988). By " 'freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory,' " *Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) (quoting H.R.Rep. No. 196, 94th Cong., 1st Sess. 58 (1975)), Congress intended to ensure that gains in minority political participation were not eroded through the establishment of new discriminatory procedures and techniques. *See Beer,* 425 U.S. at 140–41, 96 S.Ct. at 1363; H.R.Rep. No. 196 at 57–58. Under section 5, it is the state or political subdivision thereof that bears the burden of proving that its change did not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. *See* 42 U.S.C. § 1973c; *Katzenbach,* 383 U.S. at 335, 86 S.Ct. at 822.

We begin with Arizona's motion for summary judgment on the issue of discriminatory effect. The Supreme Court has held that " 'the purpose of [section] 5 has always been to insure that no voting procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.' " *See City of Lockhart v. United States,* 460 U.S. 125, 134, 103 S.Ct. 998, 1004, 74 L.Ed.2d 863 (1983) (quoting *Beer,* 425 U.S. at 141, 96 S.Ct. at 1364). Thus any change which would place a protected minority group in a position worse than its position on November 1, 1972—the benchmark for these counties—does not merit clearance. Both Arizona and the United States agree that the addition of these judgeships did not bring about any retrogression in the position of Native American voters.

The Department, however, argues that even a non-retrogressive change cannot be approved under section 5 if that change violates the results test of section 2 of the Act. Section 2 prohibits any political subdivision, not just those subject to the preclearance requirements of section 5, from imposing any voting qualification or procedure "which results in a denial or abridgment of the right ... to vote on account of race or color or [on account of membership in a language minority group]." Voting Rights Act, § 2, 42 U.S.C. § 1973(a) (1988). Section 2 thus encompasses practices and procedures which may not be retrogressive but still prevent minorities from participating equally in the political process. In an action under section 2, the complainant, not the political jurisdiction, bears the burden of demonstrating that the challenged practice violates the statute. *See Thornburg v. Gingles,* 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986).

The Department has made its Section 2 incorporation argument, without success, in three previous cases in this court. *See Texas v. United States,* Civ. No. 94–1529, at 2 (D.D.C. April 24, 1995) (memorandum order on scope of discovery); *Georgia v. Reno,* 881 F.Supp. 7, 12–14 (D.D.C.1995); *New York v. United States,* Civ. No. 94–2219, slip op. at 7–13 (D.D.C. Dec. 22, 1994). While we are not bound by the decisions in those cases, *see In Re Korean Air Lines Disaster of September 1, 1983,* 829 F.2d 1171, 1176 (D.C.Cir.1987), *aff'd sub nom. Chan v. Korean Air Lines,*

*Ltd.*, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989) (binding precedent for a district court within a circuit is set only by the Supreme Court and the court of appeals for that circuit), we of course give the highest level of consideration to the deliberation and judgment of nine of our colleagues. Since our own review convinces us that those decisions were correct, we too hold that the Voting Rights Act does not authorize a court sitting in a section 5 proceeding to require a covered jurisdiction to demonstrate that its proposed change does not violate the results standard of section 2 in order to receive clearance.

In support of its argument that section 5 incorporates section 2, the Department relies on a footnote in the Senate Report on the 1982 amendments to the Voting Rights Act that states: "In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2." S.Rep. No. 417, 97th Cong., 2nd Sess. 12 n. 31 (1982), U.S.Code Cong. & Admin.News 1982, pp. 177, 189 [hereinafter Senate Report]. Representative Sensenbrenner, who took an active role in the extension of the Act, expressed a similar view during debate on the floor. *See* 128 Cong. Rec. 14935 (June 23, 1982).

As additional evidence that Congress intended the courts and the Attorney General to deny clearance for any change that would violate the results test of section 2, the Department points to section 4 of the Act, 42 U.S.C. § 1973b, which sets forth the procedures and the substantive criteria that a covered jurisdiction must follow in order to be released or to "bail out" of the preclearance requirements of section 5. Section 4 was amended in 1982 to require a covered jurisdiction attempting to "bail out" to demonstrate that its electoral practices do not "inhibit or dilute equal access to the electoral process," § 1973b(a)(1)(F)(i) (1988), a requirement essentially identical to that of the results test in section 2. *Compare id. with* 42 U.S.C. § 1973(a); *see also* Senate Report at 54, U.S.Code Cong. & Admin.News 1982, p. 232. It is therefore appropriate under section 5, the Department contends, to review a proposed change for compliance with section 2 in order to facilitate bail-out proceedings under section 4, since a court considering a bail-out application will have to review each of the state's electoral practices under a standard equivalent to the results test of section 2.

Given the structure of the Act and the character of the 1982 Amendments, we are not persuaded by the Department's argument. Congress amended section 2 to address the Court's decision in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which held that evidence of disproportionate impact was not sufficient to prove a violation of the Fifteenth Amendment or, by extension, section 2 of the Voting Rights Act. *See Thornburg v. Gingles,* 478 U.S. at 35, 106 S.Ct. at 2758. To ensure that any voting practice that denied minorities the equal opportunity to participate in the political process could be challenged, regardless of the intent behind its enactment, Congress made major changes to the text of section 2 which make it clear that plaintiffs do not have to demonstrate purposeful discrimination in order to prevail. *See id.* at 42–46 (summarizing Senate Report at 15–43). Congress also amended the language of section 4 to incorporate this standard into the bail-out provisions. *See* 42 U.S.C. § 1973b(a)(1)(F)(i); Senate Report at 54, U.S.Code Cong. & Admin.News 1982, p. 232. Congress did not, however, alter the language of section 5 in any way. While we agree with the Department that sections 2, 4, and 5 of the Act are designed to complement and reinforce each other in order to achieve the Act's overarching purpose—the elimination of racial discrimination in voting—we cannot ignore Congress' decision to structure the Act so that each of these sections establishes a different procedure and imposes a different burden upon local jurisdictions. *See* 42 U.S.C. §§ 1973, 1973b(a) & 1973c; *Katzenbach,* 383 U.S. at 315–16, 86 S.Ct. at 812; *see also Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994). Given these distinct features, we believe that if Congress intended to work as dramatic a change in the burden that covered jurisdictions bear under section 5 as the Department suggests here, Congress would

have modified the text in that provision. The Department's proposed interpretation would undoubtedly provide additional incentives for covered jurisdictions to remove all vestiges of discrimination from their electoral practices. We agree with our colleagues, however, that the single footnote in the Senate Report is not sufficient to demonstrate that Congress intended to require a covered jurisdiction to prove that its proposed change does not violate section 2 in order to receive section 5 preclearance.

Other than its section 2 incorporation argument, the Department has not presented any requirements beyond the absence of retrogression that Arizona must satisfy under the effects prong of section 5. We therefore need not address the argument that the Department has made in other cases, *see, e.g., County Council of Sumter County v. United States,* 555 F.Supp. 694, 705 (D.D.C.1983), that the Supreme Court's statement in *Beer* that a change which is not retrogressive could "nonetheless continue so to discriminate on the basis of race or color as to be unconstitutional," 425 U.S. at 142 n. 14, 96 S.Ct. at 1364 n. 14, creates an additional standard that jurisdictions seeking section 5 preclearance must satisfy. Because the parties agree that the proposed change is not retrogressive, and because we reject the Department's section 2 incorporation argument, we will grant Arizona's alternative motion for partial summary judgment on its claim that the addition of these judgeships does not have the effect of denying or abridging the right to vote on account of race or color.

### III.

We next turn to Arizona's motion for summary judgment with respect to purpose. The touchstone for our inquiry is *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), where the Court held that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 563. Such evidence, the Court stated, includes but is not limited to any disparate

impact the state's action has on protected minority groups; the historical background of the challenged decision; the specific sequence of events leading up to that decision; any legislative or administrative history; any departure from the normal procedural sequence; and any evidence that the decisionmaker ignored factors it has considered important or controlling when making similar decisions in the past. *Id.* at 266–68, 97 S.Ct. at 563–65. We rely on this standard in resolving the issue of purpose under section 5. *See Busbee v. Smith,* 549 F.Supp. 494, 516–17 (D.D.C.1982), *aff'd,* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983).

■ Citing *New York,* Arizona argues that it is entitled to summary judgment because the Department of Justice has not alleged that the county-wide election requirement is "blatantly" or "starkly" racist. We agree that the mere extension of a discriminatory electoral system is not a "sufficient basis" for an inference of discriminatory purpose. We also agree that the extension of a "blatantly" or "starkly" racist system could create such an inference. But because "[t]he Voting Rights Act was aimed at the subtle, as well as the obvious, state [practices] which have the effect of denying citizens their right to vote because of their race," *Allen v. State Board of Elections,* 393 U.S. 544, 565, 89 S.Ct. 817, 831, 22 L.Ed.2d 1 (1969), we do not agree with Arizona that an inference of discriminatory purpose can *only* flow from the extension of a "blatantly" or "starkly" racist system. Adoption of such a rule would be entirely inconsistent with *Arlington Heights* and would seriously weaken section 5.

■ In this case, for example, the Department seeks discovery to determine whether Coconino and Navajo counties considered using the merit selection process, in which judges are nominated by a Commission and appointed by the Governor, to select their Superior Court judges. Under *Arlington Heights,* if the Department were able to show that officials considered this option but rejected it because they believed it would lead to the appointment of Native American judges, this evidence would be highly relevant to determining whether the decision to add these judges under a county-wide elec-

tion scheme was motivated by a discriminatory purpose. But under Arizona's view, the court could not even consider such evidence since the underlying electoral system is not "blatantly" or "starkly" discriminatory. This is not what Congress intended when it enacted section 5.

We are convinced that the resolution of the purpose issue in this case, when properly understood in view of *Arlington Heights,* turns upon issues that, like the question of merit selection, cannot be resolved without further discovery. For example, *Arlington Heights* held, and Arizona does not deny, that the specific sequence of events leading up to the decisions to add the four new judgeships and the legislative and administrative history of those decisions are relevant to determining whether they were motivated by a discriminatory purpose. *See Arlington Heights,* 429 U.S. at 267–68, 97 S.Ct. at 565. The Department has stated that it has not yet been able to identify and depose many of the officials—state court judges, legislators, and executive officials—who participated in the decision to add these judgeships in Coconino and Navajo counties and who opposed legislation that would have established single-member districts for the Superior Court. Arizona has provided affidavits from several local officials stating that the counties' increasing population and caseloads were the sole reason for adding the judgeships and that racial discrimination played no part in those decisions, but the Department is entitled to depose the other officials who participated in the process. Moreover, the Department takes issue with Arizona's description of the process as ministerial and determined entirely by population counts, citing evidence that the decision to add an additional seat in Navajo county did not come until two years after the county's population reached the applicable threshold and was in part precipitated by the threat of a lawsuit by an incumbent judge.

The Department seeks discovery on other issues material to a finding of discriminatory purpose, including the extent to which historical discrimination has affected and continues to affect the opportunity for Native Americans in Coconino and Navajo counties to participate in the political process and elect candidates of their choice. As the Court held in *Arlington Heights,* "[t]he historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. at 564; *see also Rogers v. Lodge,* 458 U.S. 613, 625, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982) ("Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly ... where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by the courts or made illegal by civil rights legislation, and that they were replaced by practices which, though neutral on their face, serve to maintain the status quo.").

Since the United States is entitled to reasonable discovery in order to determine if evidence of a discriminatory purpose exists, we deny Arizona's motion for summary judgment. As a general rule, "[a]n inquiry into purpose or intent is particularly unsuitable for resolution by summary judgment." *See Texas v. United States,* 866 F.Supp. 20, 27 (D.D.C.1994).

We also deny plaintiff's motion to limit discovery on the issue of purpose. We do not agree with Arizona that permitting discovery into the historical background of its judicial election scheme and past discrimination against Native Americans in Coconino and Navajo counties is tantamount to launching a section 2 proceeding challenging its existing electoral scheme under the guise of section 5. Although the inquiry required under the purpose prong of section 5 extends into areas that would also be relevant in a section 2 proceeding, this is not equivalent to requiring Arizona to demonstrate that its judicial electoral scheme complies with section 2 in order to receive clearance from this court, or to holding that the Department could prevent clearance merely by establishing a section 2 violation. A showing, for example, that the county-wide election scheme "results" in an abridgment of Native Americans' right to vote would establish a violation of section 2, but would not conclusively demonstrate that the decision to use

the same method to elect the judges was made with a discriminatory purpose. Such a finding would, in accordance with *Arlington Heights,* be just one factor among many that this court would have to consider, together with other evidence in the record, in determining whether these changes were motivated by a discriminatory purpose. *See, e.g., Busbee,* 549 F.Supp. at 516–18.

### IV.

For the foregoing reasons, plaintiff's motion for summary judgment is denied, without prejudice; plaintiff's motion to limit discovery is denied; and plaintiff's alternative motion for partial summary judgment on the issue of effect in count three is granted. An appropriate Order is filed herewith.

### *ORDER*

This matter is before this three-judge court on plaintiff's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment on the Issue of Discriminatory "Effect," which has been fully briefed and argued. The court also has before it plaintiff's Motion to Limit Discovery. Upon consideration of the motions papers and the record herein, and for reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED:

(1) Plaintiff's motion for summary judgment on the remaining counts in the complaint, counts II, III and IV, is denied, without prejudice.

(2) Plaintiff's alternative motion for partial summary judgment on "effect" in count III is granted.

(3) Plaintiff's motion to limit discovery is denied.