Theodore BAKER, Raymond Strawder, Yohannes Jackson, Mark A. Simon and Malcolm Nelson, Plaintiffs,

Milton Goodman, Anthony Canady, Tyrone Sanchez and Richard Jackson, Plaintiffs–Appellants,

v.

George E. PATAKI, Governor of the State of New York, and Philip Coombe, Acting Commissioner of the New York State Department of Correctional Services, Defendants–Appellees.

Nos. 565, 1135, 1136, 1137, Dockets 94–2163, 94–2164, 94–2165, 94–2176.

United States Court of Appeals, Second Circuit.

Argued Dec. 20, 1995.

Decided May 30, 1996.

---

Brett Dignam, New Haven, Connecticut (Deborah Archer, Richard Buery, Charlotte Burrows, David Gans, Suzanne Perry, law students, The Jerome N. Frank Legal Services Organization, New Haven, Connecticut, John S. Kiernan, Carl Riehl, Debevoise & Plimpton, New York City, of counsel), for Plaintiffs–Appellants.

John McConnell, Assistant Attorney General of the State of New York, Albany, New York (Dennis C. Vacco, Attorney General, Victoria A. Graffeo, Solicitor General, Peter H. Schiff, Deputy Solicitor General, Albany, New York, of counsel), for Defendants–Appellees.

Before NEWMAN, Chief Judge, and FEINBERG, MESKILL, KEARSE, MINER, MAHONEY, WALKER, McLAUGHLIN, JACOBS, and PARKER, Circuit Judges.

PER CURIAM:

This appeal was reheard in banc to consider the applicability of § 2 of the Voting Rights Act of 1965, Pub.L. No. 89–110, 79 Stat. 437, 437, as amended, 42 U.S.C. § 1973 (the "Voting Rights Act" or the "Act"), to New York Election Law § 5–106(2)–(5), which denies the franchise to incarcerated and paroled felons, particularly in light of the felon disenfranchisement provision of § 2 of the Fourteenth Amendment of the United States Constitution. Plaintiffs-appellants, black and hispanic incarcerated felons, appeal from a judgment entered February 22, 1994 in the United States District Court for the Southern District of New York, Vincent L. Broderick, *Judge.* In accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court dismissed plaintiffs-appellants' amended complaints, brought pursuant to 42 U.S.C. § 1983 and alleging that § 5–106(2)–(5) disproportionately deprived blacks and hispanics of their right to vote in violation of the Fourteenth and Fifteenth Amendments of the Constitution and § 1973, for failure to state a claim upon which relief could be granted. *See Baker v. Cuomo,* 842 F.Supp. 718 (S.D.N.Y.1993) (*"Baker I "*).

A panel of this Court reversed, holding, *inter alia,* that plaintiffs-appellants had stated a claim under § 1973. *See Baker v. Cuomo,* 58 F.3d 814 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995) (*"Baker II "*). The panel reaffirmed its decision in a denial of defendants-appellees' petition for rehearing. *See Baker v. Cuomo,* 58 F.3d at 824–25 (*"Baker III "*). This Court granted rehearing in banc only with respect to plaintiffs-appellants' § 1973 claims. *See Baker v. Cuomo,* 67 F.3d 39 (2d Cir.1995) (*"Baker IV "*).

Fifteen judges were potentially eligible to sit on the in banc court: the thirteen active judges of the court and the two senior judges who had been members of the original panel, Wilfred Feinberg and Thomas J. Meskill. *See* 28 U.S.C. § 46(c).[1] However, four active judges, Ralph K. Winter, Pierre N. Leval, Guido Calabresi, and José A. Cabranes, recused themselves from the in banc proceeding, including the preliminary vote on whether to rehear the appeal in banc. In addition,

---

1. Judges Feinberg and Meskill, however, were not eligible to vote on *whether* to convene the in banc court. 28 U.S.C. § 46(c); *Moody v. Albe-* *marle Paper Co.,* 417 U.S. 622, 624, 94 S.Ct. 2513, 2514–15, 41 L.Ed.2d 358 (1974) (per curiam).

after the in banc court of eleven judges (the remaining nine active judges and the two senior judges) heard oral argument, one of the active judges, Frank X. Altimari, retired from regular active service (i.e., took senior status) pursuant to 28 U.S.C. § 371(b)(1), and thus became ineligible to sit on the in banc court. *See* 28 U.S.C. § 46(c); *United States v. American–Foreign S.S. Corp.*, 363 U.S. 685, 686–87, 691, 80 S.Ct. 1336, 1337–38, 4 L.Ed.2d 1491 (1960); *United States v. Chestman*, 947 F.2d 551, 554 n. * (2d Cir. 1991) (in banc), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992).

The ten remaining judges are evenly divided as to the merits of this case. The order of the district court is therefore affirmed insofar as it dismissed plaintiffs-appellants' § 1973 claims. *See Alleghany Corp. v. Kirby*, 340 F.2d 311, 312 (2d Cir.1965) (in banc) (per curiam), *cert. dismissed*, 384 U.S. 28, 86 S.Ct. 1250, 16 L.Ed.2d 335 (1966); *Farrand Optical Co. v. United States*, 317 F.2d 875, 886 (2d Cir.1963) (in banc) (per curiam); *Drake Bakeries, Inc. v. Local 50, Am. Bakery & Confectionery Workers Int'l*, 294 F.2d 399, 400 (2d Cir.1961) (in banc) (per curiam), *aff'd on other grounds*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).[2] Accordingly, the portion of the initial panel opinion that ruled upon plaintiffs-appellants' § 1973 claims, *see Baker II*, 58 F.3d at 822–24, and the entire panel opinion that denied rehearing, *see Baker III*, 58 F.3d at 824–25, are vacated. The case is remanded to the district court to allow plaintiffs-appellants to replead their claims under the Fourteenth and Fifteenth Amendments. *See Baker II*, 58 F.3d at 822.

MAHONEY, Circuit Judge, with whom MINER, WALKER, McLAUGHLIN, and JACOBS, Circuit Judges, join:

This case presents the question whether the "results" test of § 2 of the Voting Rights Act, 42 U.S.C. § 1973,[1] may properly be ap-

---

**2.** In *Alleghany Corp., Farrand Optical Co.,* and *Drake Bakeries,* this Court, sitting in banc, divided equally as to the disposition of the appeal and affirmed by a per curiam opinion without issuing any opinions regarding the merits of the case. The Supreme Court generally follows this practice. *See, e.g., Lotus Dev. Corp. v. Borland Int'l, Inc.,* —— U.S. ——, ——, 116 S.Ct. 804, 805, 133 L.Ed.2d 610 (1996) (per curiam). *But see Ohio ex rel. Eaton v. Price,* 364 U.S. 263, 263, 80 S.Ct. 1463, 1464, 4 L.Ed.2d 1708 (1960) (opinion of Brennan, J). The practice in other circuits varies. *Compare Hill v. Lockhart,* 764 F.2d 1279 (8th Cir.1984) (in banc) (affirming per curiam without opinions on the merits), *aff'd,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), *and Penthouse Int'l, Ltd. v. McAuliffe,* 717 F.2d 517 (11th Cir.1983) (in banc) (same), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984), *with Hotel & Restaurant Employees Union, Local 25 v. Smith,* 846 F.2d 1499 (D.C.Cir. 1988) (in banc) (per curiam affirmance accompanied by separate opinions on the merits); *United States v. Klubock,* 832 F.2d 664 (1st Cir.1987) (in banc) (same); *Roesch, Inc. v. Star Cooler Corp.,* 712 F.2d 1235 (8th Cir.1983) (in banc) (same), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); *Herweg v. Ray,* 619 F.2d 1265 (8th Cir.1980) (in banc) (same; equal division as to all but one issue), *rev'd,* 455 U.S. 265, 102 S.Ct. 1059, 71 L.Ed.2d 137 (1982); *and McSurely v. McClellan,* 553 F.2d 1277 (D.C.Cir.1976) (in banc) (same; equal division as to one issue), *cert. dismissed,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978). Our prior cases do not purport to announce a rule that opinions on the merits should not be written, and we believe that there should be an option to issue them (which is obviously exercised affirmatively in this case). This is especially so because the views of this court of intermediate appeal might be useful to the Supreme Court in the event of an application for certiorari.

Although the Court is evenly divided on the merits of this appeal, we are unanimously of the view that because of the equal division, the opinions in this case are without precedential effect. *See Neil v. Biggers,* 409 U.S. 188, 192, 93 S.Ct. 375, 378–79, 34 L.Ed.2d 401 (1972) (citing *Eaton,* 364 U.S. at 264, 80 S.Ct. at 1464); *see also Penthouse Int'l,* 717 F.2d at 517; *Roesch,* 712 F.2d at 1236; *Henderson v. Fort Worth Indep. Sch. Dist.,* 584 F.2d 115, 116 (5th Cir.1978) (in banc) (per curiam), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). *See generally* Jon O. Newman, *In Banc Practice in the Second Circuit, 1989–93,* 60 Brook. L.Rev. 491, 500–01 (1994).

**1.** Section 1973 provides that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color,* or in contravention of the guarantees set forth in section 1973b(f)(2) [regard-

plied to New York's felon disenfranchisement statute, N.Y. Elec. Law § 5–106(2)–(5),[2] particularly in view of the felon disenfranchisement provision of § 2 of the Fourteenth Amendment.[3] We conclude that such an application would raise serious constitutional questions regarding the scope of Congress' authority to enforce the Fourteenth and Fifteenth Amendments, *see NLRB v. Catholic Bishop,* 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979), and would "'alter the "usual constitutional balance between the States and the Federal Government,"'" *Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) (quoting *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985))). Because it is not unmistakably clear that, in amending § 1973 in 1982 to incorporate the "results" test, Congress intended that the test be applicable to felon disenfranchisement statutes, we conclude that § 1973 does not apply to § 5–106(2)–(5). Accordingly, plaintiffs-appellants have failed to state a claim under the Voting Rights Act.

## Background

On this appeal of a motion to dismiss for failure to state a claim, we accept the factual allegations in plaintiffs-appellants' amended complaints as true. *See Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 377 (2d Cir.1995). In addition, we assume familiarity with the factual explications in *Baker I,* 842

---

ing membership in a language minority group], as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

*Id.* (initial emphasis added).

2. Section 5–106(2)–(5) provides that:

2. No person who has been convicted of a felony pursuant to the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the governor, or his maximum sentence of imprisonment has expired, or he has been discharged from parole. The governor, however, may attach as a condition to any such pardon a provision that any such person shall not have the right of suffrage until it shall have been separately restored to him.

3. No person who has been convicted in a federal court, of a felony, or a crime or offense which would constitute a felony under the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of

citizenship by the president of the United States, or his maximum sentence of imprisonment has expired, or he has been discharged from parole.

4. No person who has been convicted in another state for a crime or offense which would constitute a felony under the laws of this state shall have the right to register for or vote at any election in this state unless he shall have been pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state, or his maximum sentence has expired, or he has been discharged from parole.

5. The provisions of subdivisions two, three and four of this section shall not apply if the person so convicted is not sentenced to either death or imprisonment, or if the execution of a sentence of imprisonment is suspended.

3. Section 2 of the Fourteenth Amendment provides that:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, *is denied* to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, *or in any way abridged, except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State. *Id.* (emphasis added).

F.Supp. at 720, and *Baker II,* 58 F.3d at 816–18.

Plaintiffs-appellants Milton Goodman, Anthony Canady, Tyrone Sanchez, and Richard Jackson are black and Hispanic individuals convicted of felonies under the laws of New York State who are currently serving sentences of imprisonment at the Green Haven Correctional Facility in Stormville, New York ("Green Haven"). Pursuant to New York Election Law § 5–106(2), plaintiffs-appellants are not permitted to vote in federal, state, or local elections while incarcerated (or thereafter while on parole). *See supra* note 2.

On September 30, 1993, plaintiffs-appellants and five other black and Hispanic felons incarcerated at Green Haven filed *pro se* complaints, pursuant to 42 U.S.C. § 1983, which alleged that § 5–106 deprived them of their voting rights under the Fourteenth and Fifteenth Amendments and under § 1973. Their complaints sought declaratory and injunctive relief—primarily that the district court direct then-defendants Mario Cuomo and Thomas A. Coughlin[4] to "ensure and enable plaintiff[s] and those similarly situated to vote in the November, 1993 New York City elections, and all future elections"—and nominal damages. *Baker II,* 58 F.3d at 817.

The district court issued a memorandum order which stated that the complaints "raise[d] profound issues" that had, however, "already been examined by the judiciary with uniform negative outcomes," and that any "different approach" would more appropriately be undertaken at the appellate level. *Baker I,* 842 F.Supp. at 720. The court accordingly consolidated the cases, *id.,* declined to appoint counsel or require the defendants to answer the complaints at that juncture, *id.* at 723, undertook to "consider the variety of options which might be available were the existing rule to be re-examined," *id.* at 720, surveyed the applicable law, *id.* at 720–23, and directed that "[p]laintiffs may within 45 (forty-five) days ... respond to the considerations outlined" in the court's memorandum, *id.* at 723. The court added that "[u]nless persuasive reasons not to do so are submitted, the complaints will then be dismissed for failure to state claims on which relief may be granted." *Id.*

The ensuing submissions included amended complaints that were filed by a number of the plaintiffs.[5] Their relevant factual allegations were as follows:

10) Upon information and belief, Blacks and Latinos combined comprise approximately 22 percent of New York State's population.

11) Upon information and belief, Blacks and Latinos comprise 82 percent of New York State's prison population.

12) Upon information and belief, approximately 75 percent of New York State's prison population consists of persons from [fourteen state] assembly districts ..., which are locate[d] in New York City.

13) In 1988, New York State's Chief Judge ... commissioned a committee titled The New York State Judicial Commission On Minorities ... to study the presence and [e]ffects of racism in the state's courts.

14) In April 1991, the [Commission] reported [in a "Report on Minorities"] that there was evidence of race-based disparity in the State Courts' conviction rate and sentence type....

. . . .

21) Prior to the September 1993, New York City Primary, plaintiff informed defendant Cuomo that N.Y. Election law

---

4. Pursuant to Rule 43(c)(1) of the Federal Rules of Appellate Procedure and Rule 25(d)(1) of the Federal Rules of Civil Procedure, George E. Pataki, Governor of the State of New York, and Philip Coombe, Acting Commissioner of the New York State Department of Correctional Services, were substituted as defendants-appellees in this action upon succeeding Mario Cuomo and Thomas A. Coughlin in their respective offices.

5. Goodman, Sanchez, and Jackson have filed amended complaints, which are substantially identical, but Canady has not. *See Baker II,* 58 F.3d at 817–18. Defendants-appellees contend that they were never served with Jackson's complaint, and have neither waived service of process nor defended the action as to him. *See id.* at 818. In any event, the amended complaints of Goodman and Sanchez are indisputably before us on this appeal.

§ 5–106(5) violated the equal protection clause of the Federal and State Constitutions, and requested that Cuomo take action to ensure plaintiff's right to vote in the upcoming Citywide Primary and Election.

22) In response to plaintiff['s] request, defendant Cuomo referred plaintiff's request to defendant Coughlin for disposition.

23) . . . Coughlin issued memoranda indicating that the law denying plaintiff the right to vote was constitutional and will be enforced as always. . . .

The amended complaints further alleged that § 5–106 deprived them of the right to vote in violation of the Fourteenth and Fifteenth Amendments and § 1973, and sought corrective declaratory and injunctive relief, as well as compensatory and punitive damages. Unpersuaded, on February 18, 1994, the district court issued a brief order *sua sponte* dismissing "[t]he complaints and proposed amended complaints . . . for the reasons set forth in [*Baker I* ]."

On appeal, a panel of this Court reversed and remanded for further proceedings. *See Baker II*, 58 F.3d at 816. The panel determined that plaintiffs-appellants' Fourteenth and Fifteenth Amendment claims were deficient for failing to allege intentional discrimination, but remanded these claims with leave for plaintiffs to amend their amended complaints. *Id.* at 822. The panel also ruled that the district court's dismissal of the § 1973 claim, which pled both vote denial and vote dilution theories, 58 F.3d at 823–24, was inappropriate, and remanded this claim as well.[6] As to the vote denial theory, the panel opined that because the district court had neither received any evidence nor entertained an answer from defendants-appellees, "it could not determine whether the totality of the circumstances would reveal a Voting Rights Act violation" under the "results" standard of § 1973. 58 F.3d at 823. The

panel noted that plaintiffs-appellants did "not appear to have standing" to pursue a vote dilution claim on behalf of themselves, but speculated that they might be appropriate class representatives for black or Hispanic voters from one of the fourteen New York City assembly districts disproportionately affected by felon disenfranchisement. 58 F.3d at 824.[7]

Defendants-appellees petitioned for rehearing and suggested rehearing in banc, contending, *inter alia,* that permitting plaintiffs-appellants to state a § 1973 claim would violate § 2 of the Fourteenth Amendment by requiring New York to enfranchise convicted felons. The panel rejected this argument, stating that:

Although § 2 of the Fourteenth Amendment permits states to disenfranchise felons without proportionately diminishing the state's representation in Congress, it does not permit the states to pick and choose *among* felons in a way that violates whatever statutory protections of the right to vote Congress has enacted pursuant to its broad powers.

*Baker III*, 58 F.3d at 824.

On October 10, 1995, this Court voted to hear this case in banc, "limited to the issue of the applicability of the Voting Rights Act." *Baker IV*, 67 F.3d at 40.

### Discussion

#### A. *The Merits.*

The enactment of the Voting Rights Act in 1965 "reflect[ed] Congress' firm intention to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315, 86 S.Ct. 803, 811–12, 15 L.Ed.2d 769 (1966). There are essentially two classes of remedies established by the Act. Several provisions apply only to those jurisdictions that fall within a coverage for-

---

**6.** Discriminatory vote denial occurs, as the term denotes, when the franchise is denied on account of race. Discriminatory vote dilution occurs when a voting practice diminishes "the force of minority votes that were duly cast and counted." *Holder v. Hall*, —— U.S. ——, ——, 114 S.Ct. 2581, 2593, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring in the judgment).

**7.** Article 2, § 4 of the New York State Constitution specifies that: "For the purpose of voting, no person shall be deemed to have gained or lost a residence . . . while confined in any public prison." Thus, plaintiffs-appellants, if enfranchised, would presumably cast their ballots in one of these districts.

mula set forth in § 4(b) of the Act, 42 U.S.C. § 1973b(b). For a jurisdiction to be "covered," two conditions must be met. First, the Attorney General of the United States must make a determination that the jurisdiction in question has employed at least one of four specifically enumerated tests or devices with respect to voter qualification on November 1, 1964, November 1, 1968, or November 1, 1972 (the "coverage date").[8] Second, the Director of the Census must make a determination that fewer than fifty percent of the jurisdiction's voting age population (1) was registered to vote on the coverage date, or (2) voted in the presidential election that occurred in the November that includes the coverage date. *See* § 1973b(b).[9]

The most salient stricture currently applied exclusively to covered jurisdictions is imposed by § 5 of the Act, which specifies that a covered jurisdiction may not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on" its coverage date without first receiving preclearance from either the Attorney General or the United States District Court for the District of Columbia. 42 U.S.C. § 1973c. In an action in the district court, preclearance will be granted only if the covered jurisdiction can prove that the proposed practice "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) [regarding membership in a language minority group]." § 1973c.[10]

The Act contains a number of provisions, including § 1973, that apply to all jurisdictions, whether or not covered. As originally enacted, § 1973 barred the imposition or application of voting qualifications or procedures to "deny or abridge the right of any citizen of the United States to vote on account of race or color." This provision was construed in *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), as "hav[ing] an effect no different from that of the Fifteenth Amendment itself," *id.* at 61, 100 S.Ct. at 1496 (plurality opinion), which in turn was construed to prohibit "action by a State that is racially neutral on its face ... only if motivated by a discriminatory purpose," *id.* at 62, 100 S.Ct. at 1497. In 1982, § 1973 was amended to its present form by the Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, § 3, 96 Stat. 131, 134, "largely [in] response to [the Supreme] Court's plurality opinion in [*Bolden*]."

---

**8.** Section 4(c) of the Act defines "test or device" as follows:

> The phrase "test or device" shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

42 U.S.C. § 1973b(c). Initially, § 1973b(a) barred the use of these devices by covered jurisdictions. The ban has since been made applicable throughout the nation. *See* 42 U.S.C. § 1973aa, as added by the Voting Rights Act Amendments of 1970, Pub.L. No. 91–285, § 6, 84 Stat. 315 (1970), and amended by the Voting Rights Act Amendments of 1975, Pub.L. No. 94–73, § 102, 89 Stat. 400 (1975).

**9.** These designations are not reviewable in any court and are effective upon publication in the Federal Register, *see* § 1973b(b), but a covered jurisdiction may apply to the United States District Court for the District of Columbia for declaratory relief from the coverage regime pursuant to § 1973b(a). *See City of Rome v. United States,* 446 U.S. 156, 167, 100 S.Ct. 1548, 1556, 64 L.Ed.2d 119 (1980); *Arizona v. Reno,* 887 F.Supp. 318, 321 (D.D.C.1995) (three-judge court), *appeal dismissed,* —— U.S. ——, 116 S.Ct. 1037, 134 L.Ed.2d 114 (1996). Currently, coverage determinations are in effect with respect to nine states, plus certain political subdivisions of seven others. *See* 28 C.F.R. pt. 51, App.

**10.** Although the Act does not set standards for Attorney General preclearance, government regulations establish that the Attorney General acts as a surrogate for the district court and applies the same "purpose or effect" test. *See* 28 C.F.R. § 51.52. The Act also authorizes the Attorney General, either (1) upon the written complaint of twenty or more resident citizens that they have been denied the right to vote under color of law on account of race or color, or (2) upon finding it necessary to enforce the guarantees of the Fourteenth or Fifteenth Amendment, to require the appointment of federal examiners "to prepare and maintain lists of persons eligible to vote in Federal, State, and local elections" in a covered jurisdiction. Voting Rights Act § 6, 42 U.S.C. § 1973d.

*Thornburg v. Gingles,* 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). Thus, § 1973(a) now prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which *results* in a denial or abridgement of the right of any citizen ... to vote on account of race or color," *supra* note 1 (emphasis added), without regard to discriminatory intent.

In *Thornburg,* which involved a redistricting of the North Carolina state legislature, *see* 478 U.S. at 34–35, 106 S.Ct. at 2758, the Supreme Court elaborated upon the showing required in that vote dilution case to prove a violation of amended § 1973. The Court addressed the "flexible, fact-intensive test for § [1973] violations" envisioned by the 1982 amendment, 478 U.S. at 46, 106 S.Ct. at 2764, stressing factors set forth in the pertinent Senate report, S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07. The Court deemed these factors, while "neither comprehensive nor exclusive," *id.* at 45, 106 S.Ct. at 2763, to constitute guideposts for the application of § 1973. The Court stated that:

> The Senate Report specifies factors which typically may be relevant to a § [1973] claim: the history of voting-related discrimination in the [jurisdiction]; the extent to which voting in the elections of the [jurisdiction] is racially polarized; the extent to which the [jurisdiction] has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in

the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the [juris-diction's] use of the contested practice or structure is tenuous may have probative value.

478 U.S. at 44–45, 106 S.Ct. at 2763 (citations omitted).

*Thornburg* also discussed several discrete limits upon the scope of amended § 1973. "First, electoral devices, such as at-large elections, may not be considered *per se* violative of § [1973]." *Id.* at 46, 106 S.Ct. at 2764. The plaintiff bears the burden of proving unequal access to the electoral process under the totality of the circumstances. *Id.* Second, a showing that a jurisdiction uses "an allegedly dilutive electoral mechanism," coupled with a demonstration that a minority group is not proportionately represented, is insufficient, without more, to establish a violation of § 1973. *Id.* Finally, "the results test does not assume the existence of racial bloc voting; plaintiffs must prove it." *Id.*

Congress enacted the "results" test of amended § 1973 pursuant to its authority under the enforcement provisions of the Fourteenth and Fifteenth Amendments.[11] *See* S.Rep. No. 417 at 40, *reprinted in* 1982 U.S.C.C.A.N. 218. It is settled, however, that the Fourteenth and Fifteenth Amendments may be violated only by intentional discrimination. *See Baker II,* 58 F.3d at 822 (citing *Hunter v. Underwood,* 471 U.S. 222, 227–28, 105 S.Ct. 1916, 1919–20, 85 L.Ed.2d 222 (1985) (Fourteenth Amendment); *Bolden,* 446 U.S. at 62, 100 S.Ct. at 1497 (Fifteenth Amendment); and *Butts v. City of New York,* 779 F.2d 141, 143–45 & n. 1 (2d Cir.1985) (Fourteenth and Fifteenth Amendments), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986)); *see also Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977) (Fourteenth Amendment); *Orange Lake Assocs., Inc. v.*

---

**11.** Section 5 of the Fourteenth Amendment states: "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." Section 2 of the Fifteenth Amendment provides: "The Congress shall have power to enforce this article by appropriate legislation."

*Kirkpatrick,* 21 F.3d 1214, 1226 (2d Cir.1994) (Fourteenth Amendment); *Soberal–Perez v. Heckler,* 717 F.2d 36, 41–42 (2d Cir.1983) (Fourteenth Amendment), *cert. denied,* 466 U.S. 929, 104 S.Ct. 1713, 80 L.Ed.2d 186 (1984). Accordingly, the "results" test of amended § 1973 reaches conduct which is not directly violative of the Fourteenth or Fifteenth Amendments. The question thus presented is whether the application of amended § 1973 to § 5–106(2)–(5) is nonetheless constitutionally authorized.

*Thornburg* did not directly address the constitutionality of amended § 1973. *Cf. Chisom v. Roemer,* 501 U.S. 380, 418, 111 S.Ct. 2354, 2376, 115 L.Ed.2d 348 (1991) (Kennedy, J., dissenting) ("Nothing in [*Chisom*] addresses the question whether § [1973], as interpreted in [*Thornburg*], is consistent with the requirements of the United States Constitution."). In a series of cases involving the Voting Rights Act, however, the Supreme Court has held that Congress may constitutionally prohibit practices that are not, considered in isolation, constitutional violations, but which perpetuate the effects of past purposeful discrimination.

In *South Carolina v. Katzenbach,* the Court rejected a facial challenge to the constitutionality of the coverage formula of § 1973b, the remedies provided by the Act for jurisdictions declared within the coverage formula, and the provisions for appointment of federal examiners in covered jurisdictions. *See* 383 U.S. at 329–37, 86 S.Ct. at 819–23. In doing so, the Court stressed the "reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the Act." *Id.* at 329, 86 S.Ct. at 819. The Court pointed out that in the majority of the states falling within the coverage formula, the prohibited tests and devices, *see supra* note 8, had "been instituted with the purpose of disenfranchising Negroes, ha[d] been framed in such a way as to facilitate this aim, and ha[d] been administered in a discriminatory fashion for many years." *Id.* at 333–34, 86 S.Ct. at 821.

*Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), determined that § 4(e) of the Act, 42 U.S.C. § 1973b(e), passed constitutional muster. This provision specified that no person who had successfully completed the sixth primary grade in a public or accredited private school in "any State or territory, the District of Columbia, or the Commonwealth of Puerto Rico in which the predominant classroom language was other than English" could be denied the vote on grounds of illiteracy. § 1973b(e). Although phrased in general terms, the statute was concededly enacted "for the explicit purpose of dealing with the disenfranchisement of large segments of the Puerto Rican population in New York." 384 U.S. at 645 n. 3, 86 S.Ct. at 1720–21 n. 3. In upholding the legislation as a valid implementation of the Equal Protection Clause of the Fourteenth Amendment, the Court noted that "Congress might well have questioned" the legitimacy of New York's English literacy requirement "in light of the many exemptions provided, and some evidence suggesting that prejudice played a prominent role in the enactment of the requirement." *Id.* at 654, 86 S.Ct. at 1725 (footnote omitted).

The Supreme Court returned to the Voting Rights Act in *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). At issue in that case were 1970 amendments to the Act that imposed a temporary nationwide ban on the § 1973b(c) tests and devices, *see supra* note 8, abolished state durational residency requirements in presidential elections and provided uniform national rules for absentee voting in presidential elections, and required the states to extend the franchise to otherwise qualified eighteen-year-olds. *See* 400 U.S. at 117, 134, 91 S.Ct. at 261, 269–70 (opinion of Black, J.). The Court, without a majority opinion, upheld the ban of tests and devices and the voting-age provision as it applied to federal elections, as well as the provisions relating specifically to presidential elections, but invalidated the voting-age provision insofar as it applied to state and local elections. *See id.* at 117–19, 91 S.Ct. at 261–62 (opinion of Black, J). With respect to the literacy test ban, Justice Black, whose opinion announced the judgment of the Court, reasoned that "Congress had before it a long history of the discriminatory use of literacy tests to disenfranchise voters on account of

their race." *Id.* at 132, 91 S.Ct. at 268 (opinion of Black, J.). With respect to the invalidated voting-age provision, on the other hand, Justice Black distinguished this provision from those upheld in *South Carolina* and *Morgan* by noting, *inter alia,* that "Congress made no legislative findings that the 21–year–old vote requirement was used by the States to disenfranchise voters on account of race." *Id.* at 130, 91 S.Ct. at 267 (opinion of Black, J.).

In *City of Rome,* the City of Rome, Georgia sought preclearance, pursuant to § 1973c, for certain changes in its electoral system. As noted earlier, that provision allows a covered jurisdiction to enact a voting practice if the jurisdiction can establish that the practice "does not have the purpose *and* will not have the effect of denying or abridging the right to vote on account of race or color." § 1973c (emphasis added). The City of Rome contended that § 1973c, "to the extent that it prohibits voting changes that have only a discriminatory effect, is unconstitutional." *City of Rome,* 446 U.S. at 173, 100 S.Ct. at 1561. Relying on *South Carolina* and *Oregon,* the Court responded that: "Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact." 446 U.S. at 177, 100 S.Ct. at 1562 (footnote omitted) (citing *South Carolina,* 383 U.S. at 335, 86 S.Ct. at 822, and *Oregon,* 400 U.S. at 216, 91 S.Ct. at 310–11 (opinion of Harlan, J., concurring in part and dissenting in part)).

The proposed application of § 1973 to § 5–106(2)–(5) can find no support in any of these cases. First, although *South Carolina* and *City of Rome* upheld the "results" test of § 1973c, that provision applies only to jurisdictions that fall within the coverage formula of § 1973b(b), a formula that is at the heart of "a complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." *South Carolina,* 383 U.S. at 315, 86 S.Ct. at 812. By contrast, § 1973 applies nationwide, without distinction between (i) those jurisdictions in which Executive Branch findings create a statutory presumption that all state-enacted voting practices require enhanced scrutiny, and (ii) those jurisdictions where no such findings have been made. Second, although *Morgan* and *Oregon* upheld nationwide bans, those bans addressed specific disfavored practices that perpetuated historical discrimination of an unconstitutional kind.[12] Conversely, as we will now demonstrate, felon disenfranchisement is a very widespread historical practice that has been accorded explicit constitutional recognition in § 2 of the Fourteenth Amendment. *See supra* note 3.

As of November 1993, "all but three states deprive[d] incarcerated offenders of the vote; thirty-five states disenfranchise[d] nonincarcerated offenders, including those on probation and parole; and fourteen states disenfranchise[d] ex-offenders for life." Andrew L. Shapiro, Note, *Challenging Criminal Disenfranchisement under the Voting Rights Act: A New Strategy,* 103 Yale L.J. 537, 538–39 (1993) (footnotes omitted). The practice of disenfranchising felons is hardly, however, of recent vintage. At the time of the adoption of the Fourteenth Amendment, "29 [of 36] States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes." *Richardson v. Ramirez,* 418 U.S. 24, 48, 94 S.Ct. 2655, 2668, 41 L.Ed.2d 551 (1974); *see also id.* at 48 n. 14, 94 S.Ct. at 2668 n. 14 (collecting constitutional provisions). The prevalence of this practice prior to the passage of the Civil War Amendments indicates that felon disenfranchisement was not an attempt to evade the requirements of the Civil War Amendments or to perpetuate racial discrimination forbidden by those amendments. *Cf.* H.R.Rep. No. 439, 89th

---

**12.** Thus, it is unclear whether, as a *general rule,* the "results" methodology of § 1973 is constitutionally valid. As our discussion of the relevant case law makes clear, the Supreme Court has never authorized an uncircumscribed application of the "results" methodology of § 1973 in furtherance of the enforcement of the Fourteenth and Fifteenth Amendments, and it is the uncertainty concerning the outer limits of Congress' enforcement powers that raises the serious constitutional questions at issue in this case.

Cong., 1st Sess. 11–12, *reprinted in* 1965 U.S.C.C.A.N. 2437, 2443 ("Prior to 1890, apparently no Southern State required proof of literacy, understanding of constitutional provisions or of the obligations of citizenship, or good moral character, as prerequisites to voting. However, ... these tests and devices were soon to appear in most of the States with large Negro populations.").

Moreover, the legitimacy of felon disenfranchisement is affirmed in the text of the Fourteenth Amendment itself. *See supra* note 3. The history surrounding the adoption of § 2 of the Fourteenth Amendment is treated in considerable detail in *Richardson. See* 418 U.S. at 43–52, 94 S.Ct. at 2665–70. That case involved a nonracial equal protection challenge by three ex-felons, whose terms of imprisonment and parole had expired, to provisions of the California Constitution and implementing statutes that permanently disenfranchised persons convicted of an "infamous crime." *Id.* at 26–27, 94 S.Ct. at 2658. The Supreme Court of California upheld this challenge, *id.* at 34–35, 94 S.Ct. at 2661–62, and the Supreme Court reversed that ruling, *id.* at 56, 94 S.Ct. at 2671–72. In doing so, the Court concluded "that those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in § 1 of that Amendment that [ (i.e., felon disenfranchisement) ] which was expressly exempted from the lesser sanction of reduced representation imposed by § 2 of the Amendment." 418 U.S. at 43, 94 S.Ct. at 2665; *see also id.* at 55, 94 S.Ct. at 2671 (repeating this formulation).

The Court also addressed the felon disenfranchisement provision of § 2 in *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), and invalidated a provision of the Alabama Constitution that disenfranchised persons convicted of "any crime ... involving moral turpitude," *id.* at 223, 105 S.Ct. at 1917, on the basis that the provision, which applied primarily to misdemeanors, *id.* at 226–27, 105 S.Ct. at 1919–20, had been "enacted with the intent of disenfranchising blacks," *id.* at 229, 105 S.Ct. at 1921. The Court made it clear that this ruling was in harmony with its prior decision

in *Richardson. See* 471 U.S. at 233, 105 S.Ct. at 1922–23.

In light of this history, it is unsurprising that when Congress enacted the Voting Rights Act in 1965, both Judiciary Committees affirmatively stated that felon disenfranchisement laws were not affected by § 1973b(c)'s ban on historically discriminatory "test[s] or device[s]," including the prohibition on tests for "good moral character." *See supra* note 8; S.Rep. No. 162, 89th Cong., 1st Sess., pt. 3, at 24, *reprinted in* 1965 U.S.C.C.A.N. 2508, 2562 (joint views of Senators Dodd, Hart, Long, Kennedy, Bayh, Burdick, Tydings, Dirksen, Hruska, Fong, Scott, and Javits) ("This definition [of the impermissible 'good moral character' test] would not result in the proscription of the frequent requirement of States and political subdivisions that an applicant for voting or registration for voting be free of conviction of a felony.... It applies where lack of good moral character is defined in terms of conviction of lesser crimes."); H.R.Rep. No. 439, 89th Cong., 1st Sess. 25–26, *reprinted in* 1965 U.S.C.C.A.N. 2437, 2457 (§ 1973b(c) "does not proscribe a requirement of a State or any political subdivision of a State that an applicant for voting or registration for voting be free of conviction of a felony"). Thus, not only has Congress failed ever to make a legislative finding that felon disenfranchisement is a pretext or proxy for racial discrimination; it has effectively determined that it is not. *Cf. Oregon*, 400 U.S. at 130, 91 S.Ct. at 267 (opinion of Black, J.) ("Congress made no legislative findings that the 21–year–old vote requirement was used by the States to disenfranchise voters on account of race.").

This Court has previously recognized, moreover, that felon disenfranchisement laws are generally enacted for compelling, nondiscriminatory reasons. In *Green v. Board of Elections*, 380 F.2d 445 (2d Cir.1967), *cert. denied*, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968), we declined to convene a three-judge court to address nonracial constitutional challenges to New York's felon disenfranchisement statute because of the insubstantiality of the claims. 380 F.2d at 452. In doing so, Judge Henry Friendly forcefully, indeed eloquently, said:

The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime. A contention that the equal protection clause requires New York to allow convicted mafiosi to vote for district attorneys or judges would not only be without merit but as obviously so as anything can be.

*Id.* at 451–52 (footnote and citation omitted); *see also Wesley v. Collins*, 791 F.2d 1255, 1261–62 (6th Cir.1986) (relying upon *Green* to hold, affirming pretrial dismissal, that Tennessee felon disenfranchisement statute did not violate § 1973).

We note that in addition to the valid and neutral rationales justifying the enforcement of felon disenfranchisement statutes, these statutes generally do not present the risk of discretionary and discriminatory application that characterizes the tests and devices prohibited by § 1973b(c). *See* 111 Cong. Rec. S8366 (1965) (statement of Sen. Tydings) ("Let me emphasize that [§ 1973b(c)] does not include a requirement that an applicant for voting or registration for voting be free of conviction of a felony or mental disability. These grounds for disqualification are objective, easily applied, and do not lend themselves to fraudulent manipulation."); *cf. Oregon*, 400 U.S. at 216, 91 S.Ct. at 311 (Harlan, J., concurring in part and dissenting in part)

(noting that "literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious," and concluding that the "danger of violation of § 1 of the Fifteenth Amendment was sufficient to authorize the exercise of congressional power under § 2.").

Against this background, we believe that any attempt by Congress to subject felon disenfranchisement provisions to the "results" methodology of § 1973 would pose a serious constitutional question concerning the scope of Congress' power to enforce the Fourteenth and Fifteenth Amendments. In these circumstances, *Catholic Bishop* requires a clear statement by Congress in support of the statutory interpretation posing the constitutional question, a statement manifestly lacking in this case.

*Catholic Bishop* involved "the National Labor Relations Board's exercise of jurisdiction over lay faculty members at two groups of Catholic high schools." 440 U.S. at 491, 99 S.Ct. at 1314. Because this exercise would necessarily have required a decision on "serious First Amendment questions," *id.* at 504, 99 S.Ct. at 1320, the Court determined that before upholding it, " ' "there must be present the affirmative intention of the Congress clearly expressed" ' " in favor of that statutory interpretation. *Id.* at 500, 99 S.Ct. at 1319 (quoting *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 678, 9 L.Ed.2d 547 (1963) (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957))); *see also Miller v. Johnson*, —— U.S. ——, ——–——, 115 S.Ct. 2475, 2493–94, 132 L.Ed.2d 762 (1995) ("There is no indication Congress intended such a far-reaching application of § 5 [of the Voting Rights Act], so we reject the Justice Department's interpretation of the statute and avoid the constitutional problems that interpretation raises." (citing *Edward J. De-Bartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988) (citing *Catholic Bishop*, 440 U.S. at 499–501, 99 S.Ct. at 1318–19))); *DeMarco v. Holy Cross High School*, 4 F.3d 166, 169 (2d

Cir.1993) (adopting and applying *Catholic Bishop* "affirmative intention" standard).

*Gregory v. Ashcroft* also counsels against the application of § 1973 to New York's felon disenfranchisement statute absent a clear statement by Congress. There, Missouri state court judges sought to invoke the federal Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621–634, to invalidate a provision of the Missouri Constitution that compelled judges (other than municipal judges) to retire at age seventy. 501 U.S. at 455, 111 S.Ct. at 2398. The Court declined the invitation, noting the ambiguity involved in the attempted application of the relevant statutory terms to the state judges, 501 U.S. at 466–67, 111 S.Ct. at 2403–04, and stating that:

> "[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.' *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242 [105 S.Ct. 3142, 3147, 87 L.Ed.2d 171] (1985); see also *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 99 [104 S.Ct. 900, 907, 79 L.Ed.2d 67] (1984).... 'In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.' *United States v. Bass,* 404 U.S. 336, 349 [ 92 S.Ct. 515, 523, 30 L.Ed.2d 488] (1971)."

*Gregory,* 501 U.S. at 460–61, 111 S.Ct. at 2401 (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) (initial alteration in *Gregory* )).

In the present case, the application of § 1973 to state felon disenfranchisement statutes would at least as clearly undermine the constitutional balance between the federal and state governments. The states have the primary responsibility for regulating the times, places, and manner of conducting federal elections, U.S. Const. art. 1, § 4, cl. 1, and even more obviously for regulating elections to state office. Although the Civil War Amendments and the Voting Rights Act significantly intrude upon this state authority when discriminatory practices are apparent, those provisions have been enacted against a background of felon disenfranchisement statutes that have a long history and have been accorded explicit constitutional recognition. Thus, an *explicit* constitutional balance has been struck by the mandate in § 2 of the Fourteenth Amendment that the adverse consequence of reduced congressional representation shall not follow from the enactment and enforcement of state felon disenfranchisement statutes.

Further, "[u]nder our federal system, the ' "States possess primary authority for defining and enforcing the criminal law." ' " *United States v. Lopez,* —— U.S. ——, —— n. 3, 115 S.Ct. 1624, 1631 n. 3, 131 L.Ed.2d 626 (1995) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 635, 113 S.Ct. 1710, 1720, 123 L.Ed.2d 353 (1993) (quoting *Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982))). To the extent that the disenfranchisement of felons is designed to punish persons who violate the laws of the states, the application of § 2 to felon disenfranchisement statutes would upset " 'the sensitive relation between federal and state criminal jurisdiction.' " *United States v. Enmons,* 410 U.S. 396, 411–12, 93 S.Ct. 1007, 1015–16, 35 L.Ed.2d 379 (1973) (quoting *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)).

A few words must be said in response to Chief Judge Newman's and Judge Feinberg's contentions that the plain statement rule of *Gregory* is inapplicable in the context of congressional legislation passed to enforce the Fourteenth and Fifteenth Amendments generally, and in the context of the Voting Rights Act specifically. Chief Judge Newman asserts that in applying the plain statement rule in *Gregory* to "age discrimination legislation enacted under the Commerce Clause," the Supreme Court "distinguished legislation enacted under Congress's power to enforce the Civil War Amendments." On the contrary, the Supreme Court in *Gregory* expressly rejected any such distinction, stating that: "[W]e will not attribute to Congress an intent to in-

trude on state governmental functions *regardless of whether Congress acted pursuant to its Commerce Clause powers or § 5 of the Fourteenth Amendment.*" 501 U.S. at 470, 111 S.Ct. at 2406 (emphasis added). Thus, as Justices White and Stevens recognized in their separate opinion, under *Gregory*, "[the] plain statement rule will *apply with full force* to legislation enacted to enforce the Fourteenth Amendment." *Id.* at 479, 111 S.Ct. at 2411 (White, J., concurring in part, dissenting in part, and concurring in the judgment) (emphasis added).

Relying upon *Chisom,* Judge Feinberg states that "we have clear Supreme Court authority that the plain statement rule does *not* apply when determining coverage under § 2 of the Voting Rights Act." Upon closer examination, this "clear ... authority" turns out to be the Supreme Court's failure, without so much as a reference to the plain statement rule, to apply the rule in *Chisom,* a case involving the interpretation of the Voting Rights Act. *See* 501 U.S. at 390–404, 111 S.Ct. at 2361–69. In light of the unequivocal language in *Gregory* that the plain statement rule does apply in the context of legislation passed pursuant to the enforcement clauses of the Civil War Amendments, we decline to interpret this omission—made without any attempt to distinguish *Gregory*—as an instruction to the lower courts to refrain from applying *Gregory* in the context of the Voting Rights Act.[13]

Plaintiffs-appellants argue in effect that *Catholic Bishop* and *Gregory* are satisfied in this case, contending that the phrase "any citizen" in § 1973, *see supra* note 1, unambiguously encompasses felons. The term "employer" in *Catholic Bishop* was equally broad and was buttressed by a statutory definition that expressly enumerated a number of exempt employers (the United States, any wholly owned government corporation, and six other types of employers) without, howev-er, recognizing an exception for religious schools. The Court nonetheless determined that the high schools were not "employer[s]" within the meaning of § 2(2) of the National Labor Relations Act, as amended, 29 U.S.C. § 152(2), because the Court's "examination of the statute and its legislative history indicates that Congress simply gave no consideration to church-operated schools." *See* 440 U.S. at 504, 99 S.Ct. at 1321.

Similarly, in this case, neither the statutory language nor the legislative history of § 1973 suggests Congress' affirmative intention to apply § 1973 to felon disenfranchisement statutes. In fact, the *only* consideration of felon disenfranchisement statutes in the entire history of the Voting Rights Act that has been called to our attention is Congress' explicitly announced intention to exclude such statutes from the § 1973b(c) tabulation of prohibited tests and devices. As discussed above, that consideration was clearly hospitable to such statutes, and thus provides an even more obvious case of an absence of affirmative intent than the benign neglect encountered in *Catholic Bishop,* and an equally obvious absence of the clear affirmative statement of intention required by *Gregory.*

Finally, we address plaintiffs-appellants' contention at oral argument that § 5–106(2)– (5) is more vulnerable to a challenge premised on the "results" methodology of § 1973 · because it effects a partial, rather than a total, felon disenfranchisement. The rationale of the argument is that unlike a total ban, a partial ban allows the possibility that states will "pick and choose *among* felons in a way that violates [§ 1973]." *Baker III,* 58 F.3d at 824.

Any test for imposition of the § 1973 "results" methodology that turns on a distinction between partial and total felon disenfranchisement would find no support in, and is indeed countermanded by, the text of § 2

**13.** Contrary to Judge Feinberg's assertion, furthermore, the *Chisom* dissenters did not "agree[]" that the plain statement rule had no application to the statutory issue of coverage under § 2." Rather, Justice Scalia thought it "curious[]" that the Court applied the plain statement rule in *Gregory* but not in *Chisom,* 501 U.S. at 411, 111 S.Ct. at 2372–73 (Scalia, J., dissenting), speculat-ed as to the possible reasons for this disparity, *id.* at 411–12, 111 S.Ct. at 2372–73, impugned the majority's motives, *id.* at 412, 111 S.Ct. at 2373, and concluded that nothing in the statute supported an interpretation contrary to the statute's plain meaning, *id.,* thus rendering any invocation of the plain statement rule superfluous.

of the Fourteenth Amendment and *Richardson*, the only case in which the Supreme Court has comprehensively addressed that provision. Section 2 of the Fourteenth Amendment absolves from the penalty of reduced congressional representation state statutes that *deny or abridge* voting rights "for participation in rebellion, or other crime." *See supra* note 3. First, there is no explicit reference in this language to felonies, although the contemporary history concerning existing state constitutions and the approval of germane provisions of the constitutions of formerly rebellious states readmitted to the Union after the Civil War supports a construction of the term "other crime" as equating to common law felonies. *See Richardson*, 418 U.S. at 48–52, 94 S.Ct. at 2668–70. Second, and far more importantly, the use of the terms "den[y] ... or in any way abridge[ ]" in § 2 of the Fourteenth Amendment, *see supra* note 3, precludes any contention that this provision was intended to afford greater protection to state laws that permanently and totally disenfranchise felons than to state laws that impose a more selective ban.

Additionally, it is more than a little counterintuitive to impute to Congress, in amending § 1973 in 1982, an intention to provide a safe harbor from that statute only for the most drastic of felon disenfranchisements. It is noteworthy in this regard that the claim made in *Richardson* was that the permanent disenfranchisement (even after completion of incarceration and parole) effected by California law was so draconian as to violate the Equal Protection Clause of the Fourteenth Amendment. The Court indicated sympathy for this view as a policy matter, but suggested that it be addressed to "the people of the State of California." 418 U.S. at 55, 94 S.Ct. at 2671. The case was mooted on remand because those people had in the interim adopted a constitutional amendment that "provide[d] for the temporary 'disqualification' of electors [only] while they [were] imprisoned or on parole for the conviction of a felony." *Ramirez v. Brown*, 12 Cal.3d 912, 914, 117 Cal.Rptr. 562, 528 P.2d 378, 379 (1974). Under the interpretation of § 1973 proffered at oral argument, ironically, the earlier California standard would presumably have provided a safe harbor from § 1973, but the subsequent amelioration would have been subject to statutory attack.

Further, *Richardson* framed the issue presented for consideration on that appeal as "the precise question of whether a State may constitutionally exclude *some or all* convicted felons from the franchise," 418 U.S. at 53, 94 S.Ct. at 2670 (emphasis added), and answered that question in the affirmative. There was a suggestion at the in banc oral argument that *Richardson* nonetheless established a distinction between partial and total felon disenfranchisements because *Richardson* remanded for the California courts to consider "respondents' alternative contention that there was such a total lack of uniformity in county election officials' enforcement of the challenged state laws as to work a separate denial of equal protection." *Id.* at 56, 94 S.Ct. at 2671. It is not novel doctrine that a facially neutral law may be unconstitutionally enforced. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220 (1886) (collecting cases); *see also Miller*, —— U.S. at ——, 115 S.Ct. at 2487 (citing *Yick Wo* ). This possibility, which obviously exists with respect to *any* statute, hardly establishes that in amending § 1973 in 1982, Congress intended to apply the Act generally to felon disenfranchisement statutes, excepting only statutes that permanently disenfranchised all felons.

## B. *Rehearing in Banc.*

Judge Feinberg argues that rehearing in banc is inappropriate in this case because the standards of Rule 35(a) of the Federal Rules of Appellate Procedure have not been satisfied. Rule 35(a) specifies that rehearing in banc "is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance."

As to the first category, it is clear that *Baker II* and *Baker III* may be reconciled with this court's ruling in *Green*, although *Green* calls for considerably more deference to New York's felon disenfranchisement laws

than is evident in either *Baker II* or *Baker III*. In any event, the adherents of this opinion do not contend that rehearing in banc is needed "to secure or maintain uniformity of [this Court's] decisions." We disagree with Judge Feinberg's claim, however, that this appeal does not present "a question of exceptional importance" because of the "premature" state of the case at which the appeal comes to us.

As has been made clear, the inquiry fostered by § 1973 and its legislative history is directed primarily to the electoral practices of the several states and their political subdivisions. *See Thornburg*, 478 U.S. at 44–45, 106 S.Ct. at 2762–64. The panel opinions in this case, by contrast, would authorize a highly intrusive process of pretrial discovery into the existence, *vel non*, of racial bias throughout the entire criminal justice system of New York State, with little or no statutory guidance to channel or provide standards for the inquest. We have no doubt that if the panel decisions had remained undisturbed, similar inquiries would soon have been underway in Connecticut, as well as in other jurisdictions throughout the nation. In our view, the distinct unlikelihood that Congress foresaw or intended to authorize anything like this process when it amended § 1973 in 1982, coupled with the severe ensuing impact upon the " ' "constitutional balance between the States and the Federal Government," ' " *Gregory*, 501 U.S. at 460, 111 S.Ct. at 2401 (quoting *Will* 491 U.S. at 65, 109 S.Ct. at 2309 (quoting *Atascadero*, 473 U.S. at 242, 105 S.Ct. at 3147)), results in the presentation of "a question of exceptional importance" within the meaning of Rule 35(a), fully justifying the determination by a majority of the judges of this Court in active service to call for rehearing in banc.

We agree with Judge Feinberg that because of the even division on the merits, the in banc rehearing may have eventuated as "an exercise in futility in clarifying the law."

Obviously, however, because such outcomes cannot be predicted in advance, a preclusion of in banc rehearings because of the possibility of unclarifying results would effectively eliminate the practice.

FEINBERG, Circuit Judge (with whom Chief Judge NEWMAN and Judges MESKILL, KEARSE and PARKER join).

I respectfully disagree with Judge Mahoney's opinion in this case. I believe that the original panel opinions were correct in reversing the district court and allowing plaintiffs-appellants to proceed with their claims under the Voting Rights Act.

## I.  Background

Plaintiffs-appellants are black and hispanic convicted felons incarcerated in New York State prisons. Due to their incarceration, they are denied the right to vote by New York Election Law § 5–106. That statute disenfranchises felons serving prison sentences or on parole, but does not disenfranchise felons serving suspended sentences or sentences of probation. Plaintiffs filed pro se complaints in the United States District Court for the Southern District of New York,[1] alleging pursuant to 42 U.S.C. § 1983 that enforcement of § 5–106 violated the Fourteenth and Fifteenth Amendments of the United States Constitution and § 2 of the Voting Rights Act (sometimes called the Act hereafter), 42 U.S.C. § 1973, because, among other things, black and hispanic felons are less likely than white felons to be sentenced to probation or have their sentences suspended. Plaintiffs' amended complaints referred to a Report of the New York State Judicial Commission on Minorities, which stated that "there was evidence of race-based disparity in the State Courts' conviction rate and sentence type." See Amended Complaints ¶¶ 10–14, quoted in relevant part in Judge Mahoney's opinion, pp. 3–4. The Act gener-

---

1. This case was originally filed against then-Governor Mario Cuomo and then-Commissioner of the New York State Department of Correctional Services Thomas Coughlin. Due to the change in administration during the pendency of this appeal, the present defendants, Governor George Pataki and Philip Coombe, Acting Commissioner of the New York State Department of Correctional Services, have been substituted as parties.

ally prohibits voter qualifications and practices that result in a denial of the right to vote on account of race. The district court, Vincent L. Broderick, J., dismissed the amended complaints sua sponte pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Baker v. Cuomo,* 842 F.Supp. 718 (S.D.N.Y.1993) (*Baker I* ).

On appeal, a unanimous panel of this court reversed and remanded for further proceedings. In that opinion, 58 F.3d 814 (2d Cir.), cert. denied, —— U.S. ——, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995) (*Baker II* ), the panel determined that dismissal of the Voting Rights Act claims was inappropriate. The panel held, among other things, that plaintiffs' allegations that § 5–106 interacted with racial discrimination in the New York State criminal justice system to result in denial of the right to vote on account of race stated a claim under § 2 of the Voting Rights Act.[2] The panel expressed no view on whether plaintiffs could prove their allegations.

Defendants-appellees (referred to hereafter as the State) then petitioned for rehearing, arguing that permitting plaintiffs to obtain relief under the Act would violate § 2 of the Fourteenth Amendment. The panel denied rehearing, determining that although § 2 of the Fourteenth Amendment does authorize States to disenfranchise all felons, it does not permit States to disenfranchise some felons because of their race. 58 F.3d at 824 (*Baker III* ). Familiarity with the opinions in *Baker II* and *Baker III* is assumed.

A majority of the active judges of this court then voted to rehear the appeal in banc. *Baker v. Cuomo,* 67 F.3d 39, 40 (2d Cir.1995). The rehearing was limited to "the applicability of the Voting Rights Act." *Id.*

## II. Discussion

### A. Merits

The issue before the in banc court is simple to state: May plaintiffs, disenfranchised black and hispanic prisoners, bring a cause of action under the Voting Rights Act, claiming

that their vote has been denied for reasons of race by New York Election Law § 5–106?

Plaintiffs' case is based on § 2 of the Voting Rights Act, which was contained in the original Act passed in 1965 and was amended in 1982. As amended, the section provides in relevant part as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision *in a manner which results in a denial or abridgement of* the right of any citizen of the United States to vote on account of race or color . . . . (emphasis added).
>
> (b) A violation . . . is established if, based on the totality of the circumstances, it is shown that . . . members [of protected racial minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Prior to the 1982 amendment, the underlined language above read as follows: "to deny or abridge". The effect of the amendment is that a plaintiff now has to prove only discriminatory *result* under the totality of the circumstances test set forth in § 2(b) rather than discriminatory *intent. Chisom v. Roemer,* 501 U.S. 380, 383–84, 111 S.Ct. 2354, 2357–58, 115 L.Ed.2d 348 (1991).

Plaintiffs claim that the phrase "any citizen" in § 2(a), quoted above, covers them and argue that their amended complaints contain sufficient allegations which, if proved, would establish their cause of action. Plaintiffs contend that § 5–106, which denies incarcerated felons the right to vote, constitutes a "voting qualification" within the meaning of the Act. They also allege that § 5–106 has a discriminatory result because, due to racial disparities in sentencing, a black or hispanic felon is more likely than a white felon to be incarcerated and thus disenfranchised.

In response to plaintiffs, the State argues in Point I of its brief to the in banc court that because "[s]ection 2 of the Fourteenth

---

**2.** The panel also remanded for the district court to determine whether plaintiffs were appropriate class representatives to bring a claim on behalf

of all minority voters that the effect of § 5–106 is to dilute the voting strength of all minorities.

Amendment ... expressly authorizes the individual States to deny the vote to convicted felons.... Congress may not override this constitutional authorization by statute." In a related but somewhat different constitutional argument, Judge Mahoney's opinion holds that the results test of the amended Act may not be applied to a felon disenfranchisement statute like § 5–106 because there is no evidence that these statutes historically were used to disenfranchise minorities.

The State next argues in Point II of its brief that, in any event, "Congress did not intend the Voting Rights Act, either in its original form or as subsequently amended, to apply to state felon disenfranchisement statutes." The State backs up this argument by using what is, in effect, a canon of statutory construction. The State claims that a federal statute affecting the rights of disenfranchised felons to vote upsets "the usual constitutional balance of federal and state powers" and that under controlling Supreme Court authority, that balance cannot be altered unless Congress makes its intention to do so "unmistakably clear" by a plain statement in the language of its statute. *Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991) (citing *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)). According to the State, Congress has not done that here. Judge Mahoney's opinion also relies on this argument. I address each of these arguments in turn.

(1) *Congressional power*

The State first contends that the Voting Rights Act may not constitutionally be applied to discrimination among felons based on race because of the insulation States enjoy in matters of felon disenfranchisement by virtue of § 2 of the Fourteenth Amendment. That section provides:

Representatives shall be apportioned among the several States according to their respective numbers.... But when the right to vote ... is denied ... or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall be [proportionally] reduced....

U.S. Const. amend. XIV, § 2 (emphasis added). According to the State, the Fourteenth Amendment thus "expressly permits the State to disenfranchise convicted felons." Thus, the State's argument goes, since Congress may not override this "constitutional authorization," the Voting Rights Act "does not provide a basis for a challenge to" § 5–106. This contention, however, has been substantially undermined by the Supreme Court's decision in *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). Before *Hunter*, it might have been plausibly argued that § 2 of the Fourteenth Amendment carves all aspects of felon disenfranchisement out of the purview of the Equal Protection Clause, which is in the very same amendment. However, the Supreme Court in *Hunter* easily disposed of that contention.

The plaintiffs in *Hunter* attacked a provision in the Alabama Constitution of 1901 that disenfranchised those who had committed various crimes, including "any crime ... involving moral turpitude." The suit was brought under 42 U.S.C. §§ 1981 and 1983, and claimed, among other things, that the Alabama Constitution had intentionally disenfranchised blacks. The Supreme Court unanimously accepted this proposition and held the Alabama provision unconstitutional. The Court addressed the effect of § 2 of the Fourteenth Amendment, so heavily relied on by the State in its argument to us. The Court stated:

The single remaining question is whether [the Alabama provision] is excepted from the operation of the Equal Protection Clause of § 1 of the Fourteenth Amendment by the "other crime" provision of § 2 of that Amendment.... [W]e are confident that § 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of [the Alabama provision] which otherwise violates § 1 of the Fourteenth Amendment. Nothing in our opinion in Richardson v. Ramirez, supra, suggests the contrary.

471 U.S. at 233.

In support of its argument regarding Congressional lack of power, the State also relies on *Richardson v. Ramirez*, 418 U.S. 24, 94

S.Ct. 2655, 41 L.Ed.2d 551 (1974) and, apparently, on *Green v. Board of Elections*, 380 F.2d 445 (2d Cir.1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968). The former decision, which held that States could disenfranchise felons, was summarily brushed aside in the language from *Hunter* quoted immediately above. And *Green* did not involve either a claim of racial discrimination or the Voting Rights Act. Neither *Richardson* nor *Green* holds that felon disenfranchisement statutes that discriminate on the basis of race are beyond the reach of the Equal Protection Clause.

I agree that States have the right to disenfranchise felons; § 2 of the Fourteenth Amendment makes that clear. States, however, do not have the right to disenfranchise felons on the basis of race. And, to prevent such discrimination, I see no persuasive reason, in view of *Hunter*, why Congress may not use its enforcing power under § 5 of the Fourteenth Amendment and § 2 of the Fifteenth Amendment to bar racially discriminatory results, as it did in the Voting Rights Act.

Plaintiffs here allege that § 5–106, which disenfranchises only *some* felons, discriminates among felons *based on race*.[3] The panel did not suggest in *Baker III*, 58 F.3d at 824–25, nor do I suggest here, that plaintiffs have stated a claim under the Act merely because § 5–106 disenfranchises only some felons. While a State may choose to disenfranchise some, all or none of its felons based on legitimate concerns, it may not do so based upon distinctions that have the effect, whether intentional or not, of disenfranchising felons because of their race.

(2) Need to show past discrimination to apply the results test

Judge Mahoney's opinion apparently holds that the results test of the amended Voting Rights Act may constitutionally ban "conduct which is not directly violative of the Four-teenth or Fifteenth Amendments"[4] only if the ban "addresse[s] historical discrimination of an unconstitutional kind."[5] According to Judge Mahoney, since "felon disenfranchisement is a very widespread historical practice that has been accorded explicit constitutional recognition,"[6] applying the Voting Rights Act to § 5–106 would raise "serious constitutional questions."

Judge Mahoney's argument, taken at its fullest, would drastically limit the scope of § 2 of the Voting Rights Act, prohibiting a § 2 claim by any minority citizen in the absence of an allegation that the particular discriminatory practice had been intentionally imposed in the past in the particular jurisdiction. No case so holds. Thus, in *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), the Court dealt with a 1970 amendment to the Voting Rights Act that extended to the nation as a whole the ban on the use of literacy tests that had earlier been confined to the geographical areas where they had intentionally been used to discriminatory effect. All the members of the Court upheld the nationwide ban as a legitimate exercise of Congress' power under the Fourteenth and Fifteenth Amendments, even though there was not proof of direct Constitutional violations in every State. *Id.* at 118, 91 S.Ct. at 261–62; see also *id.* at 284, 91 S.Ct. at 344 (Stewart, J., concurring in part and dissenting in part) ("Because the justification for extending the ban on literacy tests to the entire Nation need not turn on whether literacy tests unfairly discriminate against Negroes in every State in the Union, Congress was not required to make state-by-state findings concerning either the equality of educational opportunity or actual impact of literacy requirements on the Negro citizen's access to the ballot box.").

In a subsequent decision, upholding the constitutionality of the results test contained in § 5 of the Act, the Supreme Court stated, "It is clear, then, that under § 2 of the

---

3. There is no dispute that on an appeal of a motion to dismiss for failure to state a claim, we accept the factual allegations in appellants' amended complaints as true. See *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 377 (2d Cir.1995).

4. See Judge Mahoney's opinion, p. 10.

5. See Judge Mahoney's opinion, p. 14.

6. See Judge Mahoney's opinion, p. 14.

Fifteenth Amendment Congress may prohibit practices that in and of themselves do not violate § 1 of the Amendment, so long as the prohibitions attacking racial discrimination in voting are *'appropriate'*...." *City of Rome v. United States*, 446 U.S. 156, 177, 100 S.Ct. 1548, 1561–62, 64 L.Ed.2d 119 (1980) (emphasis added); see also *Katzenbach v. Morgan*, 384 U.S. 641, 648–51, 86 S.Ct. 1717, 1722–24, 16 L.Ed.2d 828 (1966). In light of this, Congress included past discrimination as *only one of a list of factors* to be considered in determining whether there has been a violation of § 2 under the totality of the circumstances test. See *Thornburg v. Gingles*, 478 U.S. 30, 36–37, 106 S.Ct. 2752, 2758–59, 92 L.Ed.2d 25 (1986) (citing S.Rep. No. 97–417, 97th Cong., 2d Sess. 28–29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206).

Moreover, I do not agree that there is no history of use of felon disenfranchisement statutes to impose purposeful racial discrimination. Although there has been no record developed in this case, due largely to its premature dismissal sua sponte, there is evidence to suggest that felon disenfranchisement statues often have been used to deny the right to vote on account of race. See Hunter, 471 U.S. at 232, 105 S.Ct. at 1922 (disenfranchisement statute adopted at Alabama Constitutional Convention of 1901 "selected such crimes as vagrancy, living in adultery, and wife beating that were thought to be more commonly committed by blacks" in order to evade the Fourteenth Amendment); see also Andrew L. Shapiro, *Challenging Criminal Disenfranchisement Under the Voting Rights Act: A New Strategy*, 103 Yale L.J. 537, 540–543 (1993) (identifying several states that allegedly disenfranchised criminals selectively with the intent of disqualifying a disproportionate number of blacks). While felon disenfranchisement may be a widespread historical practice, disenfranchisement based on race is a historical practice that the Voting Rights Act seeks to eradicate.

In sum, I believe Congress clearly has the power to apply the results test to § 5–106, New York's felon disenfranchisement statute.

### (3) *Plain statement rule*

Next, the State contends that, even if Congress had the constitutional power to apply the Voting Rights Act to felon disenfranchisement, it did not intend to do so. According to the State, under *Gregory*, 501 U.S. at 460, 111 S.Ct. at 2400–01, a plain statement of such intent is required to upset the "usual constitutional balance" between the federal government and the States. Application of the Voting Rights Act to felon disenfranchisement, the argument goes, would upset that "balance," and the Act contains no such plain statement. Judge Mahoney's opinion also relies on this argument.[7]

However, the Voting Rights Act does not alter the constitutional balance between the federal government and the States that was established by the Fourteenth and Fifteenth Amendments. *Gregory*, 501 U.S. at 468, 111 S.Ct. at 2405 (" '[The Civil War] Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty.' ") (quoting *City of Rome*, 446 U.S. at 179, 100 S.Ct. at 1563); see also *Seminole Tribe of Florida v. Florida*, —— U.S. ——, ——, 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996) (noting that, because the Fourteenth Amendment "fundamentally altered the balance of state and federal power struck by the Constitution," the enforcement provision of that amendment allowed Congress to abrogate the States' Eleventh Amendment immunity.)

Moreover, we have clear Supreme Court authority that the plain statement rule does *not* apply when determining coverage under § 2 of the Voting Rights Act. In *Chisom*, decided the same day as *Gregory*, the Court did not apply the plain statement rule in determining whether the results test of the 1982 amendment of the Voting Rights Act applied to the election of state judges. Significantly, Justice Scalia and the other three dissenters, all of whom disagreed with the Court's application of the statute to judicial elections, nevertheless agreed that the plain statement rule had no application to the statutory issue of coverage under § 2. As Justice Scalia put it, "the possibility of applying

7. Judge Mahoney's opinion, pp. 19–25.

that rule never crossed [the Court's] mind." 501 U.S. at 412, 111 S.Ct. at 2373. Moreover, Justice Scalia expressed the view that the "plain statement" rule probably does not apply to Congressional exercises of authority under the Fourteenth Amendment. *Id.*

Manifestly, the conduct of state judicial elections, which was at issue in *Chisom,* is a matter of great significance to States. Indeed, it would seem that application of § 2 of the Voting Rights Act to state judges, a result that can change district boundaries, is at least as much of an intrusion of federal authority into state affairs as the effort of plaintiffs here to apply § 2 in a way that, at most, might permit some felons to vote.

In addition, *Gregory* makes clear that the "plain statement" rule applies only when the statute is ambiguous. 501 U.S. at 470, 111 S.Ct. at 2406. The Voting Rights Act does not seem to be ambiguous. "Any citizen" usually means any citizen, and I submit that it does so in the Voting Rights Act. The State appears to accept this proposition.[8] It argues, however, that the legislative history of the 1965 Act shows that felon disenfranchisement statutes were not "tests or devices" as defined by section 4(c) of that Act, 42 U.S.C. § 1973b(c).[9] This, according to the State, creates an ambiguity: whether the legislative history of § 4(c) of the 1965 Act creates an unwritten exception to § 2 of the Act, in both its original and amended forms. Thus, the argument continues, prohibiting a State from disenfranchising felons is barred under *Gregory* unless the intention to do so is clearly expressed in the Act.

The argument is without merit. I do not believe the 1965 legislative history of § 4(c), which makes clear that felon disenfranchisement statutes are not tests or devices, can properly be used to interpret § 2, which does not even use these terms. The Voting Rights Act operates in two different ways. The use of tests and devices (as defined in § 4(c) at the time the Act was first passed), combined with low voter registration or low voter turnout, subjects a particular jurisdiction to § 5, which prevents any future change in voting practices without first obtaining either a declaratory judgment from the United States District Court for the District of Columbia or preclearance from the Attorney General. 42 U.S.C. § 1973c. In contrast, § 2 applies nationwide and covers any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right ... to vote." 42 U.S.C.1973; see also *Allen v. State Bd. of Elections,* 393 U.S. 544, 566–67, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969) (by using the terms "standard, practice, or procedure" Congress indicated its intention to give § 2 of the Act "the broadest possible scope"). Because §§ 2 and 4 have different purposes, scope and language, the legislative history of § 4(c) is not necessarily applicable to interpretation of § 2, *United States v. Uvalde Consol. Indep. School Dist.,* 625 F.2d 547, 550 (5th Cir.1980), cert. denied, 451 U.S. 1002, 101 S.Ct. 2341, 68 L.Ed.2d 858 (1981), and certainly cannot create an ambiguity requiring use of the plain statement rule where the textual language of § 2 is perfectly clear.

---

**8.** In response to Chief Judge Newman's query at oral argument whether the State was inviting the court to find the term "any citizen" ambiguous, the attorney for the State had the following reply:

> That's not correct your Honor. There may be some conceivable manner in which an incarcerated felon could challenge some other practice apart from that of a state felon disenfranchisement statute. We are not saying that the subject here, [the] person challenging the statute is what should be amended or modified. We are simply saying there is an exception to the application of § 2 which derives from § 4(c) and § 3(b) that has always been recognized within the Act, and that [exception] applies to a type of statute no matter who makes the challenge.

**9.** Section 4(c) provides:

> The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

The legislative history makes clear that the prohibition against good moral character tests was not meant to prohibit States from disenfranchising felons. S.Rep. No. 162, 89th Cong., 2d Sess. ___ (1965), reprinted in 1965 U.S.C.C.A.N. 2508, 2562.

When the Voting Rights Act was passed in 1965, § 2 apparently protected a potentially large group of people ("any citizen") against racially-motivated, intentional discrimination with respect to voting rights. That large group could challenge a felon disenfranchisement statute, regardless of the legislative history behind § 4(c). This proposition is, as already indicated, directly supported by *Hunter* in which disenfranchised felons successfully sued under the Fourteenth and Fifteenth Amendments to set aside Alabama's intentional denial of their right to vote because of their race. Admittedly, the plaintiffs in *Hunter* did not raise a claim under the Voting Rights Act. But it seems clear that they could have because it is undisputed that, prior to the 1982 amendment of the Voting Rights Act, § 2 of that Act was coextensive with the Fourteenth and Fifteenth Amendments. *City of Mobile v. Bolden,* 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1495–96, 64 L.Ed.2d 47 (1980) (Stewart, J.); see also H.R.Rep. No. 439, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 2437. There is apparent agreement that the only effect of the 1982 amendment is to allow a plaintiff to show racial discrimination by proving discriminatory result rather than discriminatory intent. Therefore, because disenfranchised felons like the plaintiffs here could have brought an action under the 1965 Act, they continue to have the right to protection under the amended Act.

In sum, I reject the argument that there is ambiguity in the Voting Rights Act that requires it to contain a plain statement of congressional intent to affect felon disenfranchisement.

Finally, I have considered all of the State's other arguments for affirming the district court and find them to be without merit.[10]

## B. Rehearing In Banc

Before closing this opinion, something should be said about the propriety and usefulness of an in banc rehearing of this appeal. Rule 35(a) of the Federal Rules of Appellate Procedure (FRAP) allows a majority of the circuit judges who are in regular active service to rehear an appeal in banc. However, "[s]uch a ... rehearing *is not favored* and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance." (emphasis added). *Id.* This case raises neither concern. There is no issue as to uniformity of circuit law. As already indicated, the original panel opinion in *Baker II* does not conflict with this court's prior opinion in Green v. Board of Elections; indeed, the panel opinion quoted extensively from it. *Green* upheld the constitutionality of New York Election Law § 152, which deprived all convicted felons of the right to vote. 380 F.2d at 452. *Green* did not involve discrimination among felons on the basis of race, nor did it involve the Voting Rights Act, as the present case does.

Furthermore, this appeal is too premature to present an issue of "exceptional importance." The pro se complaints were dismissed by the district court sua sponte before an answer was received. Therefore, the appeal arises at an extremely early stage in the proceedings, with virtually no record developed in the district court. Moreover, the original panel did not determine that § 5–106 violates the Voting Rights Act or even intimate, on this phase of the case, that plaintiffs were likely to be able to prove their allegations. The panel merely held that plaintiffs were entitled to try to do so. Nor did the panel say that, in the event that plaintiffs could establish a violation, prisoner enfranchisement would be the appropriate remedy. Thus, it would have been wiser to wait until a later stage in these proceedings before embarking on the rare (in this circuit) and time-

---

**10.** This includes the State's reliance on *Wesley v. Collins,* 791 F.2d 1255 (6th Cir.1986). Without getting into the merits of the State's argument based on *Wesley,* that plaintiffs cause their disenfranchisement by committing felonies, that case does not deal adequately with the claim of racial discrimination. Every felon, by definition, has committed a felony. However, plaintiffs here claim, among other things, that because black and hispanic felons are more likely than white felons to be incarcerated, their race is an independent, and impermissible, cause of their disenfranchisement. Plaintiffs should be allowed to try and prove this claim.

consuming procedure of an in banc rehearing.

Our annual filings have in recent years soared to approximately 4,000. Mere substantive disagreement with a panel decision is not, under FRAP 35, sufficient reason for an in banc rehearing. If we do not follow the clear spirit of the Rule, we will become mired in endless internal review. This creates much additional work and slows down the pace of other cases. See Jon O. Newman, In Banc Practice in the Second Circuit, 1984–1988, 55 Brook. L.Rev. 355, 369 (1989); Jon O. Newman, In Banc Practice in the Second Circuit: The Virtues of Restraint, 50 Brook. L.Rev. 365, 382 (1984). The lack of benefit is compounded in this case, where the court is evenly divided. The opinions issued today will have no precedential effect. Thus, § 5–106 can be challenged on the same grounds by different minority plaintiffs. Since some or all of the four judges who are recused from this case may not have a conflict in a subsequent case, future plaintiffs might receive a different result than the present plaintiffs do today.

In sum, the in banc proceeding here was not required either to maintain uniformity or to decide an issue of exceptional importance. Moreover, this in banc proceeding has turned out, as so many do, to be an exercise in futility in clarifying the law.

JON O. NEWMAN, Chief Judge, with whom PARKER, Circuit Judge, joins, concurring in Judge Feinberg's opinion:

I concur fully in Judge Feinberg's comprehensive and persuasive opinion, and also express these additional thoughts.

When a state makes a distinction among felons concerning their eligibility to vote that has the effect of denying Blacks the right to vote to a much greater extent than Whites, a case challenging the distinction can be viewed as mainly a case about felons or mainly a case about race. That difference in approach is fundamentally what evenly divides the ten judges of this in banc court. The substantive dispute between the opinions of Judge Mahoney and Judge Feinberg, upon analysis, turns out to be rather narrow.

Judge Mahoney's opinion discusses at length the provision of the second section of the Fourteenth Amendment that permits states to deny felons the right to vote without suffering loss of representation. But nothing in Judge Mahoney's opinion goes so far as to suggest that the insulation derived from this provision would permit a state to deny only Black felons the right to vote. The Supreme Court has made unequivocally clear that disenfranchisement of Black felons because of their race violates section one of the Fourteenth Amendment. *See Hunter v. Underwood,* 471 U.S. 222, 233, 105 S.Ct. 1916, 1922–23, 85 L.Ed.2d 222 (1985). Thus far, the in banc court is in agreement.

We divide on the issue of whether the Voting Rights Act, enacted by Congress in the exercise of its constitutional authority to enforce the discrimination prohibitions of the Fourteenth and Fifteenth Amendments, applies to a discrimination among felons that has the result of disproportionately denying the franchise to Blacks compared to Whites. Even on this issue, we start in agreement with the indisputable proposition that the Voting Rights Act, with its use of a "result" test to supplement an "intent" test, is a valid exercise of Congressional power, at least in some, though not necessarily all, circumstances. *See City of Rome v. United States,* 446 U.S. 156, 177, 100 S.Ct. 1548, 1561–62, 64 L.Ed.2d 119 (1980). We begin to divide, however, on the question of whether Congressional power to enforce by a "result" test the constitutional ban against voting discrimination based on race may validly reach a voting discrimination among felons. Judge Mahoney's opinion heads toward a negative answer, but concludes only that such an application of the Voting Rights Act "would pose a serious constitutional question."[1] 85

---

1. Judge Mahoney suggests that under the views expressed in the panel opinion in this case, the broad prohibition against felon voting previously in effect in California would be lawful but the limited disenfranchisement of only some felons, *see Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct.

F.3d at 930. Judge Feinberg's opinion cogently resolves the constitutional issue in favor of Congress's constitutional authority.

Where we ultimately divide is on the question whether the Voting Rights Act should be construed to apply the "result" test of section 2 to racial discrimination among felons. Judge Mahoney says the Act should not be so construed because of the absence of a clear statement by Congress to apply the Act to racial discrimination among felons. That view raises the subsidiary, but in the end crucial, issue of whether in this context a clear statement of Congressional intent is required.

Judge Mahoney requires a clear statement of Congressional intent because the Supreme Court in other contexts has required such a statement. *See, e.g., Gregory v. Ashcroft,* 501 U.S. 452, 460, 111 S.Ct. 2395, 2400–01, 115 L.Ed.2d 410 (1991) (narrow construction to avoid altering constitutional balance of federal and state powers); *NLRB v. Catholic Bishop,* 440 U.S. 490, 500, 99 S.Ct. 1313, 1318–19, 59 L.Ed.2d 533 (1979) (narrow construction to avoid First Amendment issue). But, as Judge Feinberg points out, the Su-

preme Court has already decided that section 2 of the Voting Rights Act is not subject to the plain statement rule. *See Chisom v. Roemer,* 501 U.S. 380, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (application of section 2 of Voting Rights Act to judicial elections without requiring plain statement of such coverage).[2]

There is a fundamental reason why the plain statement rule does not apply in determining the coverage of section 2 of the Voting Rights Act. The Fourteenth and Fifteenth Amendments have already altered the constitutional balance of federal and state powers, as the Supreme Court has explicitly recognized. *See Gregory,* 501 U.S. at 468, 111 S.Ct. at 2404–05. *Gregory,* in requiring a plain statement before age discrimination legislation enacted under the Commerce Clause would be construed to apply to state judges, distinguished legislation enacted under Congress's power to enforce the Civil War Amendments. *Id.* Moreover, the pending case presents no ambiguity as to the construction of section 2 of the Voting Rights Act.

2655, 41 L.Ed.2d 551 (1974), would, ironically in his view, have been subject to scrutiny under the Voting Rights Act upon a proper showing of a racial discriminatory result. If that be irony, it inheres in every equal protection challenge ever brought. The fact that states may prohibit certain activities entirely or deny some activities to legitimately defined classes obviously does not mean that they may create discriminations based on race, even if such discriminations can be viewed as an "amelioration," 85 F.3d at 933, from the standpoint of those in the favored category.

2. Judge Mahoney enlists one sentence from *Gregory* to challenge the contention that the plain statement rule is inapplicable to issues arising as to the scope of section 2 of the Voting Rights Act. In ruling that a plain statement was required before the Age Discrimination in Employment Act of 1967 ("ADEA") would be construed to apply to state judges, the Supreme Court said, after noting an ambiguity as to whether the ADEA applied to appointed judges, "In the face of such ambiguity, we will not attribute to Congress an intent to intrude on state government functions regardless of whether Congress acted pursuant to its Commerce Clause powers or § 5 of the Fourteenth Amendment." *Gregory,* 501 U.S. at 470, 111 S.Ct. at 2406.

Since *Gregory* construed the ADEA, not the Voting Rights Act, it is not readily apparent why the statement quoted from *Gregory* is any aid to an understanding of whether the plain statement rule applies to section 2 of the Voting Rights Act. But the sentence (albeit dictum since the Court had no need to decide whether the ADEA was an exercise of Congress's power to enforce the Fourteenth Amendment, *see id.* at 480 n. 1, 111 S.Ct. at 2411 n. 1 (opinion of White J., with whom Stevens, J., joins, concurring in part and dissenting in part)) is some indication that some members of the Court would seek a plain statement before determining the scope of some ambiguous provisions of a statute enacted to enforce the Civil War Amendments. Nevertheless, section 2 of the Voting Rights Act was applied to make an important inroad on state authority in *Chisom,* and no plain statement was required. The need for a plain statement in order to determine whether the ADEA applies to ascertain when state court judges must end their service (because of mandatory retirement) and the lack of need for a plain statement in order to determine whether section 2 of the Voting Rights Act applies to ascertain whether state court judges were properly chosen to begin their service is eloquent testimony that the plain statement requirement has no application to section 2.

If this were a case mainly about felons and we were construing an ambiguous provision enacted under the Commerce Clause, Judge Mahoney's requirement of a plain statement might well be appropriate. But since it is a case mainly about race and we are construing an unambiguous provision enacted to enforce the Civil War amendments, that search is most inappropriate. Judge Mahoney cites only one decision of the Supreme Court where the Court relied (in part) on the absence of explicit Congressional intent as a reason for its construction of a statute implementing the Civil War amendments. *See Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Judge Mahoney's reliance on that decision is an exquisite irony. *Miller* was a suit by White voters challenging a state's Congressional districting plan as a racial gerrymander in favor of Blacks. The plan received the Justice Department's clearance, required under section 5 of the Voting Rights Act, only after it was revised, at the Department's urging, to create three "majority-minority" districts. *Id.* at ——, 115 S.Ct. at 2484. In *Miller,* the Justice Department urged a construction of section 5 of the Act that, in the Supreme Court's view, would have *broadened* the provision *to require a race-based remedy.* The Court declined to construe section 5 to authorize what it regarded as racial discrimination in the absence of Congressional intent to extend section 5 so far. Judge Mahoney now enlists that decision to *narrow* the coverage of a statute that, as written, would apply in this case *to eliminate racial discrimination.*

There is no sound reason for narrowing section 2 of the Voting Rights Act to exempt application of the result test to racial discrimination among felons. An example of a discrimination similar to the one challenged in this case might make the point clearer. If a state legislature reached the conclusion that a college education enhanced one's ability to vote, and for that reason permitted college-educated felons to vote, Black felons without a college degree would be entitled to prove that the resulting discrimination fell disproportionately on them and achieved a result barred by section 2, despite the absence of any indication of discriminatory intent. The plaintiffs in the pending case are similarly entitled to prove that a *racially* discriminatory result has been created by New York's decision to distinguish among all felons by granting the vote to felons serving suspended sentences or sentences of probation, but denying the vote to felons serving prison sentences or on parole. Whether plaintiffs can prove that New York's distinction among felons violates section 2 requires the opportunity to develop a full record. It is unfortunate that the effect of today's decision is to deny the plaintiffs that opportunity.

I join Judge Feinberg's opinion.